In the Matter of THE COLUMBIA GAS SYSTEM, INC., and Columbia Gas Transmission Corporation, Debtors.

Bankruptcy Nos. 91–803, 91–804.

United States Bankruptcy Court, D. Delaware.

Jan. 30, 1998.

---

8. *In re HBLS, L.P.,* Chapter 11 Case No. 93 B 46399 (S.D.N.Y. December 19, 1997).

Michael P. Kessler, Weil, Gotshal & Manges, LLP, Houston, TX, for Weil, Gotschal & Manges LLP.

Thomas Herlihy, III, Herlihy, Harker & Kavanaugh, Wilmington, DE, for Exxon Corporation.

Gregg M. Galardi, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Union Pacific Resources Company.

Scott W. Fisher, Garwin, Bronzaft, Gerstein & Fisher, LLP, NY, for Derivative Plaintiffs.

Martin Bienenstock, Weil, Gotshal & Manges, LLP, NY, for Exxon Corporation.

Michael L. Cook, Mark Gross, Skadden, Arps, Slate, Meagher & Flom, NY, for Union Pacific Resources Company.

Steven H. Felderstein, Diepenbrock, Wulff, Plant & Hannegan, LLP, Sacramento, CA, for California Public Employees Retirement System.

Robert S. Brady, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Debtors.

Henry A. Heiman, Heiman, Aber & Goldlust, Wilmington, DE, for Derivative Plaintiffs.

Teresa K.D. Currier, Duane Morris & Heckscher, Wilmington, DE, for Diemling, Schrieber & Park.

Chaim J. Fortgang, Wachtell, Lipton, Rosen & Katz, NY, for Teachers Insurance Annuity Association & Metropolitan Life Insurance Company.

John D. McLaughlin, Jr., Esquire, Office of the United States Trustee, Philadelphia, PA.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Chief Judge.

In the Columbia Gas Transmission (TCo) Chapter 11 case, Exxon Corporation, Weil, Gotschal & Manges L.L.P., and Union Pacific Resources Company have applied for compensation and reimbursement of expenses pursuant to 11 U.S.C. § 503(b). In the Columbia Gas System (CG) Chapter 11 case, three entities, the derivative plaintiffs' counsel, certain Public Pension Funds, and certain noteholders, have applied for compensation and reimbursement of expenses pursuant to 11 U.S.C. § 503(b). This is the court's Opinion on these applications.[1] These are core matters. 28 U.S.C. § 157(b)(2)(A) & (B).

### I. *Procedural History*

CG and TCo filed Chapter 11 bankruptcy petitions in this court on July 31, 1991. Plans in each of these two cases were confirmed on November 15, 1995, over four years later.

The confirmation orders in the two cases set a bar date for the filing of applications pursuant to section 503(b) ("substantial contribution applications"). The above entities filed substantial contribution applications. This court issued a scheduling order allowing discovery, and the filing of certain supplemental papers. Case no. 91–803, docket no. 5072. TCo and CG filed a joint objection with respect to four of the applications that are the subject of this Opinion. This court held hearings on each of the applications. Considerable documentary evidence was submitted, and the interested parties submitted a substantial amount of briefing either in support or in opposition to the applications.[2] The record is now closed. Section II contains findings of fact pertinent to the applicants in the TCo case. Section III discusses the law applicable to all the applications. Section IV contains further findings of fact and rulings of law with respect to the TCo applicants. Section V contains further findings of fact pertinent to the applicants in the CG case. Section VI contains further findings of fact and rulings of law with respect to the CG applicants.

### II. *Facts Concerning the TCo Bankruptcy Case*

To say that the Chapter 11 proceedings during this four year period were "complex" would be an understatement. CG listed assets of over three billion dollars and liabilities of over two billion dollars. TCo listed assets of over two and one half billion dollars and liabilities of over two billion dollars. These filings were totally unplanned, in the sense that the debtors had not negotiated respective plans of reorganization prior to the filings with any of their respective creditor or equity constituencies. In 1991, TCo was a company that owned and operated a 19,000 mile natural gas transmission pipeline network and related extensive underground gas storage fields that served parts of thirteen states in the Northeastern, Mid–Atlantic, Midwestern and Southeastern regions of the

---

1. Other entities filed applications under section 503(b) in either the TCo or CG case. However, all those applications have been resolved by prior court order or settlement.

2. On June 13, 1996, the United States Trustee for the Third Circuit also filed objections to three of these applications. The deadline for filing such objections was April 18, 1996, Case no. 91–803, docket no. 5072, and the objections offered no reason for their untimeliness. The United States Trustee also did not appear at the evidentiary hearings of May 8, 1996, and February 3 and 4, 1997. The court deems the objections untimely and they will not be considered.

United States. TCo's customers were gas distribution companies, gas marketers, producers and end users of gas. Its rates, charges, services and facilities were subject to regulation by the Federal Energy Regulatory Commission (FERC), primarily pursuant to the Natural Gas Act.

TCo was a wholly-owned subsidiary of CG, which is registered under the Public Utility Act. Pursuant to this Act, certain of CG's activities were regulated by the Securities and Exchange Commission.

In addition to the statutory committees for the unsecured creditors of each of the two debtors, very early on in the cases, an official committee for customers of TCo was formed. This court also ordered the appointment of an official committee of equity security holders in the CG case. Later in the cases, an ad hoc committee for Southwest (Gas) Producers and an ad hoc committee for Appalachian Producers was formed. Bankruptcy hearings for the two debtors were typically combined, and often the courtroom contained over 50 lawyers.

The unplanned nature of these bankruptcies was amplified by the economic size, number, and quality of unresolved issues relating to operational and restructuring issues. What follows is a brief discussion of the major issues, focusing primarily on the TCo case.

## A. The Major Bankruptcy Issues in TCo

### 1. The Rejection Claims

Soon after the Chapter 11 filings, TCo rejected more than 4,800 above-market gas purchase contracts. These rejections resulted in rejection claims filed by gas producers in an aggregate amount of over $13 billion. These objected-claims presented an obstacle to reorganization because of the size of those claims as filed. Moreover, TCo recognized that it would have been extremely time-consuming for the court to consider the merits in the first instance of even a portion of these claims. TCo and the official committee for the unsecured creditors of TCo recognized these obstacles, and contemplated that a global process would be needed to resolve these claims. In July 1992, TCo filed an omnibus objection to the claims of gas producers, and a related estimation motion. The objective of the estimation motion was to establish a consistent methodology for calculating contract rejection and other producer claims. In August 1992, this court entered an order providing for an estimation procedure, including a procedure for initial resolution of issues generic to all or to large categories of gas supply contract claims ("generic issues"), and subsequent resolution of issues specific to particular rejected contracts. Since that time, a claims mediator has been implementing that order. Extensive evidentiary hearings have occurred on the many issues contemplated by the estimation procedures order. An initial report addressing the generic issues was issued on October 13, 1994 and a supplemental report was issued on February 17, 1995. As will be discussed later, the issuance of these reports were significant in the context of TCo's ability to reorganize. The claims estimation process remained very active through the effective date of the TCo plan, and has continued since then as well.

### 2. The Intercompany Litigation

Another large financial and reorganizational issue relating to these two cases was the so-called "intercompany litigation." CG intended to retain ownership of TCo after confirmation. In its schedules filed at the beginning of the case, TCo listed CG as a creditor having a secured claim of about $1.4 billion, and an unsecured claim of about 300 to 400 million dollars.

In March 1992, the TCo creditors committee filed an adversary proceeding against CG, challenging the validity of the secured claim, and seeking to equitably subordinate most or all of CG's claim against TCo. This proceeding sought the equivalent of *billions* of dollars in monetary relief against CG and for the benefit of TCo. As a reorganizational matter, the issues of ownership of TCo, and the new value, if any, that CG would have to give the creditors of TCo for the continued ownership of TCo, would have to wait until this adversary was resolved. Several other parties intervened in this adversary. A massive amount of discovery was commenced.

CG filed a dispositive motion, with multiple rounds of briefing. Needless to say, this adversary was not resolved quickly. Eventually, the reference of this adversary was withdrawn, and the United States District Court for the District of Delaware conducted a six week trial ending October 25, 1994. After the conclusion of that trial, the parties to that adversary announced a settlement. The value of this settlement to TCo was assessed at $550 to $600 million.

### 3. *The Customer Issues*

TCo's status as a regulated gas transmission company brought into the bankruptcy forum creditors' rights issues involving its customers. During TCo's Chapter 11 case, the customers asserted that their refund claims should receive a treatment different and better than that of other pre-petition unsecured claims under several legal theories. One theory, that of a trust fund, was heavily litigated in this court, and resulted in one of this judge's longest Opinions in 24 years, and appeals of that Opinion up to the United States Supreme Court.

The law established by the trust fund litigation did not result in a victory for the customers. They then pursued another theory, that of recoupment and/or setoff. The related recoupment and setoff motions resulted in briefs by dozens of parties that stacked several feet high. Settlement discussions between TCo and the customers began in the last half of 1994 and resulted in a broad-based agreement to resolve many customer issues.

### 4. *The IRS claim*

The Internal Revenue Service filed against TCo and CG a priority income tax proof of claim for approximately $553 million. In October 1994, this court approved a settlement resolving all pre-petition tax claim issues. The settlement provided that TCo was obligated to pay the IRS' allowed claim of $134.6 million with interest.

### 5. *The Initial Producer Settlement*

On April 14, 1995, TCo, CG, and a group of 18 or 19 producers executed a settlement agreement. The agreement provided for the claims of the group of producers to be allowed in a total amount of $1.329 billion. The agreement was subject to two major conditions, that:

1. A total of 90% of the producer claims (by amount) be settled by a certain date; and

2. A plan be confirmed by June 28, 1996.

An extensive evidentiary hearing on the settlement agreement was held on June 15, 1995, and the court approved the agreement.

During that hearing, John E. Beerbower, Esquire, counsel to TCo since 1984, testified extensively about the claims resolution process, and the related attempts to create a confirmable plan of reorganization. The early plan negotiations were focused on establishing a "pot." A pot plan would define an amount of money that was the total financial exposure of TCo, and then in some fashion distribute that money to the creditors of TCo. However, there were significant problems in reaching agreement concerning the size of the pot and the distribution of those monies.

First, because of the pending intercompany litigation, the value of TCo and the size of the pot were subject to a large swing in the potential range of values. Second, because of the aforementioned problems concerning valuation of the producer claims, and the intercreditor disputes as to the relative ranking of their claims, as well as the sheer number of creditors involved, no settlement could be reached on the distribution issues. *E.g.*, Case no. 91–803, docket no. 4446 at 9–15. Thus, as Beerbower recognized, earlier on in these Chapter 11 cases, there were simply too many variables to bridge the gap through negotiations on these disputes.

Beerbower went on to identify the *many* events that occurred that allowed TCo to formulate a plan. There were court rulings on various motions. Beerbower emphasized that what was important was not the particular ruling the court made, but the mere fact that the court had resolved an issue one way or another.

There were the afore-mentioned settlements with the IRS, and the customers. It

is significant in the context of the TCo substantial contribution applications that most if not all of these rulings and settlements occurred before the initial producer settlement.

Yet another significant event for TCo's reorganization prospects occurred when the claims mediator issued his initial report (October 1994). This report addressed a wide range of generic issues relating to the producer claims, including calculation of the price of gas, the volume of gas, and the discount rate to apply to future damages. Among other things, the report recommended that damages would be limited to proven reserves, which had a dramatic effect on some of the larger claims filed. The issuance of the report also demonstrated that despite the significant time and expense that had been incurred to get to that stage of the claims estimation proceedings, there remained the potential for considerably more contested and protracted proceedings, and that liquidation of producer claims through those proceedings rather than a settlement process was going to take a very long time.

Finally, as Beerbower testified, by the end of 1994, the trial on the intercompany claims had been completed, and while no decision had issued, those attending the trial could evaluate the evidence and thus make a more reasoned evaluation of the merits of claims, and thus the value of TCo.

In January and February 1995, John Croom, the chairman and chief executive officer of CG, John Hunt, a partner at Cravath Swaine, and Beerbower discussed the formulation of a concept to confirm Chapter 11 plans of reorganization in the near future, rather than several years down the road. The concept was to achieve an initial settlement with a critical mass of producers that would allow for the calculation of a distribution amount. A key premise of the concept was that as for creditors who did not agree to an allowance amount, CG would assume the risk that the ultimate allowed amount of the claim after contested proceedings might be higher than TCo's internal assessment of the value of the claim. As Beerbower explained, the settlement concept incorporated multiple variables, so that initial talks with creditors were quite conditional. A second

key premise was that the creditors would know the treatment of their claim, so that a creditor could place a real dollar value on the settlement of its claim. A third premise was that there was a reasonable possibility of distributions before the end of 1996.

In late February, the CG board and the various official committees were informed of this settlement initiative. Thereafter, TCo conferred with the TCo creditors committee about plan issues. To minimize the risk of additional exposure to TCo, TCo and its creditors committee imposed the additional requirement that 90% of producer claims by dollar amount be settled prior to a date certain. By March 14, Beerbower believed TCo had a handshake deal with sufficient producers to go forward.

### 6. *The Disclosure Statement*

On July 18, 1995, this court approved a disclosure statement in TCo pursuant to 11 U.S.C. § 1125. The TCo disclosure statement language most important to the section 503(b) applications presently before this court reads:

> 6. The Cornerstone of the TCo Plan: The Columbia Omnibus Settlement
>
> The Plan is premised on an omnibus settlement proposal by Columbia providing, in consideration of (a) the retention by Columbia of the equity of Reorganized TCO, (b) the settlement of the litigation over the liquidation of the Producer Claims of the Initial Accepting Producers, Customer Claims and of certain other Disputed Claims, and (c) the settlement and release of the claims raised or which could have been raised in the Intercompany Claims Litigation and various other claims and disputes between TCo's Creditors, TCo and Columbia, for:
>
> > (I) the monetization for the benefit of TCo's Creditors (other than Columbia) of the amounts necessary to fund the Plan;
> >
> > (ii) the guaranty of payment of distributions to TCO's Creditors as provided under the Plan (excluding assumed obligations);

(iii) the Columbia Customer Guaranty;

(iv) avoidance of the delay in and diminution of Creditors' recoveries from the Estate consequent to (I) a waiver of TCO's right to impose a Bar Date on most pre-petition Claims against the Estate by public environmental enforcement agencies, and (ii) the assumption of such Claims and certain other pre- and post-petition Claims by Reorganized TCO; and

(v) satisfaction of a portion of the Columbia Secured Claim with new secured debt securities of TCO (in lieu of cash) and the contribution of the balance of that Claim to TCO's equity in order to facilitate reorganization.

Case No. 91–804, docket no. 1879 at 31–32. Substantively similar language appears in the CG disclosure statement. Case No. 91–803, docket no. 4569 at 21–22.

TCo's confirmed plan distributed to its creditors about $3.9 billion. All distributions to producers outside the convenience class were guaranteed by CG.

## III. *The Applicable Law*

Each application in the TCo case cites as a legal basis 11 U.S.C. § 503(b)(3)(D), and § 503(b)(4), which state:

> After notice and a hearing, there shall be allowed administrative expenses, ..., including—
>
> \* \* \* \* \* \*
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> \* \* \* \* \* \*
>
> (D) a creditor, ..., in making a substantial contribution in a case under Chapter 9 or 11 of this title;
>
> \* \* \* \* \* \*
>
> (4) reasonable compensation for professional services rendered by an attorney ... of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3)(D), *amended by* 11 U.S.C. § 503(b)(3)(F) (October 1994); § 503(b)(4). The objection of TCo and CG to the applications of the Exxon Corporation, Weil, Gotschal & Manges L.L.P., and Union Pacific Resources Company in the TCo case rests primarily on the argument that none of these applicants "substantial[ly] contribut[ed]" within the meaning of section 503(b)(3)(D).

The Third Circuit Court of Appeals has spoken on the meaning of substantial contribution in *Lebron v. Mechem Financial Inc.*, 27 F.3d 937 (3d Cir.1994). As stated in *Lebron*:

> The services engaged by creditors, creditor committees and other parties interested in a reorganization are presumed to be incurred for the benefit of the engaging party and are reimbursable if, but only if, the services 'directly and materially contributed' to the reorganization.
>
> Thus, '[i]n determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.' '[S]ervices which substantially contribute to a case are those which foster and enhance ... the progress of reorganization.'
>
> Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging 'meaningful creditor participation in the reorganization process,' and 'keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors.' Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection. Most activities of an inter-

ested party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement. Nevertheless, the purpose of § 503(b)(3)(D) is to encourage activities that will benefit the estate as a whole, and in line with the twin objectives of § 503(b)(3)(D), 'substantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate.

27 F.3d 937, 943–44 (citations omitted). Each applicant has the burden to show it is entitled to reimbursement under section 503(b) by a preponderance of the evidence. *Id.* at 944; *In re Buckhead America Corp.,* 161 B.R. 11, 15 (Bankr.D.Del.1993).

IV. *Discussion of the Section 503(b) Applications in the TCo Case*

A. *General Comments Applicable to all the TCo applications*

Before addressing the specifics of each application in the TCo case (which is done in subsections B and C below), some general comments are called for. None of the applicants are claiming they undertook "unusual" or "extraordinary" actions that typically provide the basis for an approved substantial contribution application. *See e.g., In re Buckhead America Corp.,* 161 B.R. 11, 16 (Bankr.D.Del.1993); *9085 E. Mineral Office Bldg. Ltd.,* 119 B.R. 246, 250 (Bankr.D.Colo. 1990). The TCo applications are quite different from those granted in other cases, such as where a creditor compromised its own claim and created a plan which paid creditors more than the debtor's proposed plan, *e.g.,* 119 B.R. 246, or dramatically improved treatment of creditors under the plan, *see In re Geriatrics Nursing Home, Inc.,* 195 B.R. 34, 37 (Bankr.D.N.J.1996), or obtained interest payments for creditors, *e.g., Ex parte Roberts,* 93 B.R. 442 (D.S.C.1988), or enhanced the disclosure of information available to an

impaired class. *E.g., In re Texaco,* 90 B.R. 622, 629, 630 (Bankr.S.D.N.Y.1988).

Indeed, as accurately stated by the law firm of Weil, Gotshal & Manges, L.L.P., "[t]he plan of reorganization confirmed in this chapter 11 case was the result of complex, adversarial and extended negotiations and legal maneuvering among the parties in interest." Case no. 91–804, docket no. 2538 at 19, ¶ 35. In other words, the activities of the parties in interest in this case were typical of those in a Chapter 11 case (on a very large scale), without the type of unusual action by a creditor usually found in a meritorious substantial contribution application.

Instead of asserting unusual action, the applicants assert substantial contribution through "progress" or "key role." That is, the applicants assert their activities promoted the progress of TCo's reorganization through the key role that they performed. As discussed in Section II., there were at least five major issues that impeded a consensual reorganization. None of the applicants in the TCo case assert they are responsible for resolving all five issues, or a majority of them. The applicants assert they participated with others during one of many phases within one reorganizational matter that was eventually resolved, and that they assisted in the resolution of that matter.

Even assuming those assertions to be true, the court has a great deal of difficulty in believing that the requirements of section 503(b) could be satisfied. In comparing the alleged "contributions" to the size and reorganizational complexity of the TCo case, the court has a great deal of difficulty finding that the activities of the applicants qualify as substantial contributions. Given the facts of this Chapter 11 case, to find for the applicants would essentially emasculate the "substantial" element from the standards of 11 U.S.C. § 503(b). The court does not think that is the law in this Circuit or what Congress intended by enacting this section.

Relatedly, there is a general doctrine that priority statutes such as section 503 should be strictly construed to keep administrative expenses at a minimum so as to preserve the estate for the benefit of the credi-

tors. *E.g., In re Stoecker,* 128 B.R. 205, 208 (Bankr.N.D.Ill.1991). It is in the context of the types of "progress" substantial contribution applications presently before the court that this doctrine has particular significance. Application of this doctrine strongly argues against the granting of the TCo applications given the small amount of alleged progress compared to the reorganizational hurdles TCo had to surmount.

The court will assume, however, that each application could overcome these threshold problems, and address the specifics of each application.

### B. *The Application of Union Pacific Resources*

■ The Union Pacific Resources Company has filed an application pursuant to 11 U.S.C. § 503(b)(3)(D) and § 503(b)(4) for $135,370 in reimbursement of legal fees and $8,444 in reimbursement of non-legal expenses. Attached to the application are time sheets.

Union Pacific's basis for its application is that it "played a successful and undeniably crucial role in negotiating and structuring the ... Producer Agreement To Settle Claims Subject to Plan of Reorganization." Case No. 91–804, docket no. 2543 at 2. Union Pacific further asserts that the dollars sought in the application reflect time devoted exclusively to the producer agreement and related documents.

To be sure, Union Pacific's participation was important to the producer settlement process. As TCo's largest creditor, and as chair of the official committee of unsecured creditors of TCo, Union Pacific needed to be on board earlier on in the settlement process to give that process an air of credibility. TCo sought Union Pacific's assistance in formulating a global settlement, and sought Union Pacific's active participation in effectuating that settlement.

Nonetheless, Union Pacific has not proven a substantial contribution in the CG case. The evidence showed that the participation of many parties-in-interest was needed for the producer settlement concept to work.

Furthermore, Union Pacific had a strong economic self-interest in accepting the producer settlement. *E.g.,* Case no. 91–804, docket no. 2779 at 159, 180. Union Pacific received one of the two largest distributions under the plan. Union Pacific, just as TCo, had a strong self-interest in supporting the producer settlement, since it was necessary to obtain the acceptance of the other largest producers and achieve a 90 percent threshold for the settlement process to move forward and for Union Pacific to get paid sooner rather than later. *E.g., id.* at 180–81. Indeed, part of Union Pacific's obligation to TCo was to actively support the initial producer settlement. Furthermore, as a member of the committee, Union Pacific had a fiduciary obligation to promote a settlement that benefited the best interests of the creditor body. *E.g., In re County of Orange,* 179 B.R. 195, 202–203 (Bankr.C.D.Cal.1995); Case no. 91–804, docket no. 2765, ¶ 11.

Union Pacific has also emphasized that it assisted in drafting the producer agreement and further asserted that it was not obligated to do so. Whatever the degree of assistance Union Pacific provided during the drafting process, representatives of the debtors and not Union Pacific negotiated the settlement amounts of the 18 or 19 initial settling producers. Finally, the initial settlement could not take effect without sufficient producers settling to reach the 90% threshold.

Union Pacific's activities would have been undertaken absent expectation of reimbursement from the estate, and did not rise to the level necessary to constitute direct or material contributions to the reorganization of TCo. For all the reasons stated in this subsection and in subsection A, Union Pacific did not make a substantial contribution in the TCo case.

### C. *The Applications of the Exxon Corporation and Weil, Gotshal & Manges L.L.P.*

The Exxon Corporation has filed an application pursuant to section 503(b)(3)(D) of Title 11, in the aggregate amount of $3,933,-326.76. Case no. 91–804, docket no. 2539. This amount is the total of $939,348.66 in fees and expenses that Exxon paid certain ex-

perts in connection with the claims estimation proceedings, and $2,993,978.10 in fees and expenses Exxon paid its law firm Weil, Gotshal & Manges, L.L.P. for certain work performed during the TCo case. The WG & M firm has filed a separate but related application pursuant to section 503(b)(4) of Title 11 in the amount of $2,993,978.10. Case no. 91–804, docket no. 2538. Of this latter total amount, $2,734,570.00 is for professional services rendered that Exxon believes constitute a substantial contribution, and $259,408.10 is for expenses related to these services. This application includes certain time records of the firm.

Exxon was a member of the unsecured creditors committee in the TCo case. While the law firm of Sidley & Austin represented the creditors committee as a whole, Exxon retained its own counsel, Weil, Gotshal & Manges, L.L.P., to represent its own interests, which were not always coincident with the interests of the creditors committee.

The services Exxon believes provided a substantial contribution involve three matters in the TCo case: The claims estimation proceeding, the initial producers settlement agreement, and the intercompany claims litigation.

### 1. Exxon did not Provide a Substantial Contribution in Connection With the Claims Estimation Proceeding.

■ During one of many phases of the claims estimation proceedings, the producers and TCo litigated the issue of an appropriate generic methodology to estimate producer claims resulting from TCo's rejection of gas contracts. The prevailing methodology would be utilized to estimate all claims. Exxon was a producer and asserted a very large proof of claim against the TCo estate.

Because the nature of the producer contracts with TCo varied, and because the facts relating to those contracts varied, the adoption of a particular methodology would benefit some producers, and detriment others. Thus, the litigation concerning the appropriate methodology was far from a two-party

dispute. It was not a question of TCo advocating a methodology that would minimize claims, and the producers uniformly advocating a second methodology. Rather, TCo, Exxon, and many other producers each advocated a particular methodology, and each methodology benefited that entity. For example, TCo's methodology, commonly referred to in the claims estimation proceedings as the "life of reserve" formula, would have minimized producer claims in the aggregate.

Exxon advocated the use of "the date of breach method." In support of this method, Exxon presented expert witnesses, had its lawyers attend numerous pre-hearings and hearings and submit numerous briefs. Exxon now seeks reimbursement in the present substantial contribution application for this work of its professionals, and related expenses.[3]

On October 13, 1994, an initial report was issued addressing the methodology issues. Certain parties requested reconsideration. On February 17, 1995, a supplemental report was issued. These reports collectively recommended a methodology that would be utilized to estimate all claims. The reports recommended the use of a variation of the date of breach concept for pricing, a "proved reserve" concept for volume, and a 10% discount rate. See generally Case no. 91–804, docket nos. 1362, 1514.

Exxon argues that the methodology it advocated during this phase of the claims estimation proceedings was substantially adopted by the reports, which it argues "became the cornerstone for settlement of the Producers' claims." Case no. 91–804, docket no. 2665 (reply brief) at 3. Exxon concludes it enhanced TCo's reorganization prospects. Exxon seeks reimbursement for the work of its professionals and related expenses performed in advocating its proposed methodology. This argument is without merit, for several reasons.

First, as TCo points out. Exxon's choice of methodology primarily benefited its own

---

**3.** Some of these services or expenses are for professionals other than "an attorney or an accountant," 11 U.S.C. § 503(b)(4), and thus are not reimbursable. *In re Granite Partners, L.P.,* 213 B.R. 440, 454 (Bankr.S.D.N.Y.1997).

interests. In response, Exxon has asserted that it "did not advance a methodology that would maximize [its] claim amount." Case No. 91–804, docket no. 2538 at 11. Nonetheless, the record shows that Exxon advanced a methodology that created a larger recalculated claim for Exxon than the proposals of any of the other producers. Case No. 91–804, docket no. 2779 at 79–80. Exxon also had a significant interest in moving the estimation proceedings along. Exxon therefore made an educated choice to advance a methodology that not only protected its interests, but was more likely to be adopted than a more extreme methodology.

Second, Exxon's methodology was but a one of many links relating to the initial producer settlement. The concept of a generic methodology, while it may have been supported by Exxon, was proposed by the debtors in consultation with the official creditors' committee and approved by this court. Exxon's methodology was not adopted in its entirety by the reports. The reports modified Exxon's pricing and volume proposals; the reports selected a different discount rate altogether; and the reports created exceptions for particular producers.

And even the methodology that was recommended in the reports was not strictly adhered to in reaching settlement amounts with producers who were not in the initial settling group, but whose settlements were necessary to reach the 90% threshold. The settlement process with producers involved ameliorating some of the reports' harsh effect on certain claims, and relied also upon TCo's life-of-reserve calculated amount. Case no. 91–804, docket no. 2538 at 10.

Third, as for Exxon's cornerstone argument, Exxon's methodology was opposed by the other producers. *E.g.*, Case no. 91–804, docket no. 2538 at 8; docket no. 2779 at 80–83. Thus, Exxon's methodology was not one which all the other parties rallied around to produce a consensual rather than a litigated result. Similarly, Exxon actively opposed the other proposed methodologies.[4] These facts are not characteristic of activities that

qualify as a substantial contribution. *See In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir.1986). Exxon's proposed methodology did not in and of itself move the TCo case forward.

What moved the reorganization process forward was issuance of the initial report, which created the existence of a single method applicable to the calculation of producer claims. This allowed for a critical mass of producers willing to support the settlement. Prior to the issuance of the report, one of the problems that made it difficult for the producers to resolve their claims with Columbia was that there was no uniform method recommended by a neutral party to apply to the recalculation of claims. Thus, the actual method chosen was relatively unimportant, as long as the method chosen evolved from a equitable and unbiased process, which it did. *See* Case no. 91–804, docket no. 2779 at 83; Case no. 91–803, docket no. 4569 at 19.

2. *Exxon did not Provide a Substantial Contribution in Connection With the Initial Producers Settlement Agreement.*

 Exxon is also seeking reimbursement for time spent in connection with the initial settlement negotiated between TCo and producers. The TCo creditors committee was not significantly involved in these negotiations. Exxon asserts that it played a leading role in the negotiations by attending meetings, and talking to other initial settling producers. Exxon further asserts that it was involved in the drafting of the settlement agreement. Exxon believes these activities constitute a substantial contribution.

TCo was Exxon's largest pipeline customer, and TCo's emergence from bankruptcy was important to Exxon. Case no. 91–804, docket no. 2779 at 75–77. Moreover, Exxon was unwilling to settle until it knew how the plan was going to be structured, and unless CG guaranteed the payments of TCo. Exxon, just as Union Pacific, had an obligation to TCo to actively support the initial producer

---

4. Exxon's work in opposing TCo's proposed methodology was duplicative of that of the official unsecured creditors' committee of TCo, which also actively opposed TCo's proposed methodology.

settlement. Furthermore, as a member of the committee, Exxon had a fiduciary obligation to promote a settlement that benefited the bests interests of the creditor body. *E.g., In re County of Orange,* 179 B.R. 195, 202–203 (Bankr.C.D.Cal.1995); Case no. 91–804, docket no. 2765, ¶ 11. Finally, the initial settlement could not take effect without sufficient producers settling to reach the 90% threshold.

As for the drafting process, there is obvious tension as a factual matter between the assertions of Exxon and Union Pacific. Both claim their drafting role resulted in a material benefit to the estate. In any event, the WG & M firm would have had to be involved in the drafting process to protect the sizeable interests of its client. WG & M's involvement in the drafting indeed benefited its client through the protection of those interests. That the debtors allowed Exxon to have more control over the drafting process of a document that significantly affected Exxon's interests does not provide a basis for a finding of direct and material benefit to the estate. The Court further finds that Exxon did not play a leading role in the settlement process, and any benefit to the estate created by Exxon was incidental.

### 3. *Exxon did not Provide a Substantial Contribution in Connection With the Intercompany Claims Litigation.*

Exxon is also seeking reimbursement for time spent in connection with the intercompany claims litigation. Exxon admits that the TCo creditors' committee carried the laboring oar throughout the entire litigation. Nevertheless, Exxon asserts that it provided a key and material role in the litigation on such matters as discovery, strategic planning, witness selection, briefing and pleading preparation, trial preparation, and pre-trial settlement negotiations. *See generally* Case no. 91–804, docket no. 2538 at 16, Exxon's efforts in this regard did not create a cognizable, direct and material benefit to the intercompany claims litigation, let alone the TCo estate as a whole.

■ In conclusion, Exxon's extensive participation in TCo's case is not in and of itself sufficient to show substantial contribu-

tion. *In re Buckhead America Corp.,* 161 B.R. 11, 15 (Bankr.D.Del.1993). With respect to each of the three aspects of Exxon's application, the record shows that Exxon acted primarily to protect its own interests. Furthermore, Exxon's activities were not of the type that if absent, progress towards reorganization of TCo would have been substantially diminished. *E.g., In re Jack Winter Apparel, Inc.,* 119 B.R. 629, 636–37 (E.D.Wis.1990). For all the reasons stated in this subsection and in subsection A. Exxon did not make a substantial contribution in the TCo case.

### V. *Additional Facts Concerning the CG Bankruptcy Case*

Before addressing the applications in the CG case, the court will discuss additional facts relevant to the reorganization of CG. The reorganization of CG was linked to the reorganization of TCo principally because CG required resumption of payments due to it on its claims against TCo in order to meet its own debt service requirements. Validation of those claims had been delayed pending resolution of the intercompany claims litigation.

The three most important reorganization issues in the CG case related to the intercompany claims, the borrowed money claims, and certain currency matters. The intercompany claims have already been discussed. The other two matters are discussed below.

### A. *The Borrowed Money Claims*

As of the petition date, CG had loans outstanding under various short-term and long-term borrowing arrangements in an aggregate amount of approximately $2.4 billion ("the borrowed money claims"), including about $900 million in the form of debentures, about $450 million in the form of medium term notes, and about $500 million in bank debt. These borrowed money claims represented substantially all of the third party claims against CG.

The official committee of unsecured creditors of CG asserted unsecured creditors were entitled to post-petition interest on those obligations, on a compound basis, as well as

other payments such as yield maintenance. The official committee of equity security holders, however, questioned the entitlement to any of these interest payments. A related issue was the form of payment on allowed claims of CG creditors ("the currency issues"). Eventually, CG proposed a compromise addressing the allowance and calculation of post-petition interest, and addressing the currency issues. This proposal, as modified and accepted, was embodied in CG's plan, which was confirmed.

### B. The Securities Actions

Shortly before the Chapter 11 filings, 17 complaints were filed in the United States District Court for the District of Delaware against CG, various of its current and former officers and directors, and certain of its underwriters and its accountants. These actions alleged, among other things, that the defendants made materially false and misleading statements regarding CG's financial condition. The actions sought class action status, and money damages. These actions were not settled until after July 1995.

### VI. Discussion of the 503(b) Applications in the CG case

### A. The Application of the Derivative Plaintiffs' Counsel

■■■ A group of law firms who call themselves derivative plaintiffs' counsel have filed an application for compensation in the amount of $125,000.00. The application does not cite any section of the Bankruptcy Code as the basis for the application. However, this application was filed on January 29, 1996, just before the deadline for substantial contribution applications, and the court and the parties in interest have treated this application as a substantial contribution application.

The asserted factual basis for this application is as follows: After a press release concerning the financial health of CG and TCo, but before the Chapter 11 filings, certain plaintiffs sued the Board of CG in Delaware Chancery Court for breach of fiduciary duties to CG ("the derivative action"). The

action sought, inter alia, damages CG was forced to incur in connection with a 1991 securities class action before The Honorable Joseph J. Farnan, Jr. of the United States District Court. The first amended plan included a proposal to settle the claims raised in the class action for $18 million, to be funded exclusively by CG. Subsequently, CG negotiated with its D & O Insurance carrier to achieve a broader resolution of claims in the class action. The new settlement required the carrier to contribute money on behalf of the individual defendants to a global resolution of all securities claims. Under the new settlement. CG's required contribution declined from $18 million to $16.5 million. Thus, according to the derivative plaintiffs' counsel, the derivative claims provided a vehicle to facilitate negotiations with the D & O insurance carrier and reduced from $18 million to $16.5 million the dollar amount Columbia would be required to pay in connection with a global resolution of all the securities claims embodied in the class action. The derivative plaintiffs' counsel have attached timesheets representing $254,827.25 in fees and documents reflecting an additional $35,296.38 in expenses. However, they are requesting only $125,000, apparently because of an agreement reached with CG that CG would not object to a substantial contribution application of up to $125,000.

■■■ Notwithstanding the absence of objections to this application, this court has an independent obligation to review the application to determine its merits. In re Busy Beaver, 19 F.3d 833, 843–44 (3d Cir.1994). Based upon this review, the application must be denied, for two reasons.

First, the application is defective on its face. As observed above, the application does not cite any section of the Bankruptcy Code—and for good reason. There is no section of the Code that allows a professional, independent of an application pursuant to section 503(b)(3), to seek reasonable compensation for services rendered in a Chapter 11 case.[5] Thus, the application of derivative plaintiffs' counsel lacks a legal basis.

---

**5.** This situation is different from the application of Weil Gotschal & Manges, which is tied to, and

554

Assuming that the applicants could sur-. mount this legal hurdle, and further assuming all the facts as asserted by the applicant to be true, the application would still be without merit. The applicants are asserting an enhancement of the CG estate in the amount of $1.5 million. The connection between the derivative claims, however, and the reduction in CG's liability payment from $18 million to $16.5 million is tenuous at best, and is not a direct benefit and result of the applicant's involvement in the securities litigation. The court is hard-pressed to understand how initiating and continuing this lawsuit should be viewed as promoting CG's reorganization, rather than interrupting its progress. *See In re Consol. Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986). It was CG and not the applicants who negotiated the $1.5 million reduction. Finally, the $1.5 million reduction in CG's payment does not constitute a material benefit given the size of the CG case. The derivative plaintiffs counsel have not shown a substantial contribution.

### B. *The Application of California, Ohio, & Texas Retirement Systems*

█ The California Public Employees Retirement System, the State Teachers Retirement System of Ohio, and the Teacher Retirement System of Texas (collectively, "the Public Pension Funds") have jointly filed an application pursuant to 11 U.S.C. § 503(b)(3)(D) and § 503(b)(4) for reimbursement of $244,408.50 in legal fees and $76,642.67 in other expenses. The Public Pension Funds have attached time sheets to their application. The time period covered by these applications is approximately August 1991 through the effective date of the CG plan. The application is supported by both CG and the official committee of equity security holders.

The official members of the committee were mostly holders of relatively small amounts of CG's common stock, and were generally unsophisticated with respect to

complex Chapter 11 issues. The Public Pension Funds held about 5% of CG's equity, and in contrast to the official members of the equity committee, the Public Pension Funds had relevant experience through its prior participation in the reorganization in other large and complex Chapter 11 cases. However, the Public Pension Funds were not eligible to serve on the official committee of equity security holders in the CG case. They were, however, invited to participate in the meetings of the equity security committee.[6]

As an invitee, the Public Pension Funds actively participated on the equity security committee, the negotiating subcommittee, and the corporate governance subcommittee. The Public Pension Funds took a leadership role in guiding the equity security committee, in formulating positions of the committee, and negotiating with other parties.

Because of its prior experience in Chapter 11 cases and its large interest in the CG case, the Public Pension Funds had a level of credibility with other parties in interest that would not have otherwise been available to the equity committee. The Public Pension Funds was thus able to develop a strong working relationship with the senior management of CG. Through the Public Pension Funds's involvement and efforts, the equity committee was able to participate in the selection of directors and the new chief executive officer of CG going forward. Thereafter, the stock of CG increased considerably in value, and CG was able to retain its ownership of TCo.

As a result of the Public Pension Funds's role in the Chapter 11 case, the value of CG was maximized, and there were benefits to CG and its estate far beyond any benefit to the Public Pension Funds's own interests. Furthermore, in contrast to the primary theme of the other substantial contribution applications in the TCo and CG cases, the benefits provided by the Public Pension Funds did not arise out of a litigation, or a settlement and compromise scenario, but was

is really just an amplification of the application of Exxon, a creditor.

**6.** Since the filing of the TCo case, the relevant section of the Bankruptcy Code has been revised,

and a public pension fund is now eligible to serve on an official committee. *See generally* 11 U.S.C. § 1102.

based upon the overall constructive approach of the Public Pension Funds towards issues of concern to equity holders. Thus, while the efforts of the Public Pension Funds undoubtedly benefited their own interests, their efforts also provided direct and material benefit to others in the CG case. Based upon these findings and the record in the CG case, the application of the Public Pension Funds will be approved in the amounts requested.

### C. The Application of Teachers Insurance and Metropolitan Life Insurance Company

 Creditors Teachers Insurance & Annuity Association and Metropolitan Life Insurance Company ("the noteholders") had claims arising from certain debentures, commercial paper and medium term notes. The noteholders chaired the official committee of unsecured creditors of CG. One reorganization issue present in the CG case related to the treatment of CG's borrowed money claims. In addition to the disputes between the equity security committee and the creditors' committee, there were inter-creditor disputes. These disputes related to the relative rights of the various types of debt. Counsel for the official committee of unsecured creditors determined not to get involved in this inter-creditor dispute.

There was a need for a uniform position among the borrowed money claims in connection with those claimants' negotiations with the equity security committee. The Wachtell firm took a lead in negotiating a unified front, and in negotiating with the equity security committee.

CG was solvent during its Chapter 11 case, and the Wachtell firm argued for post-petition interest on those claims, at contract default rates, and compounded pursuant to the terms of the contracts. The underlying contracts also contained make-whole provisions, and the Wachtell firm also argued that the holders of those contracts were additionally entitled to allowed claims with respect to those contractual make-whole provisions. The debtors and the equity committee took a position much less favorable to the claimants, and in particular, believed interest only at the Federal rate was appropriate. Ultimately a compromise was reached whereby the creditors committee agreed to forgo the claims for make-whole amounts and interest at the default rate, and the debtors and the equity committee agreed to pay post-petition interest at the applicable non-default contract rate (8% compounded). This compromise was embodied in the CG plan, which was accepted by all classes.

The noteholders seek $400,000 of $542,-021.98 in fees and expenses billed by their law firm, Wachtell, Lipton, Rosen & Katz. The noteholders reach the $400,000 amount by subtracting from the overall bills of the Wachtell firm time expended for proof of claims, specific issues, chinese walls, and other activities not asserted to relate to a substantial contribution. The noteholders have not attached timesheets to their application.

The estate did not get larger as a result of the noteholders' actions. Case no. 91–803, docket no. 5328 at 36. The noteholders' actions helped resolve inter-creditor disputes, and disputes between the creditors and the equity security holders. Thus, this application is another of the "progress" type discussed in Section IV.A. The noteholders believe its activities created a common position on currency and interest issues, promoted possibility of consensual resolution of the borrowed money claim issues, eliminated potential litigation and shortened the duration of the CG case.

The results the noteholders assert are admirable. This court has always encouraged parties in interest to resolve economic and legal differences through a consensual rather than an adversarial process. Nonetheless, settlements of the type asserted here cannot ordinarily and independently provide a basis for a finding of substantial contribution. Cf. In re F.E. Frederick Enterprises, Inc., 146 B.R. 360, 363 (Bankr.W.D.Pa.1992) (unsecured creditor who negotiated a plan provision requiring payments to start 20 months earlier than debtor's proposal did not make substantial contribution).

Moreover, under the facts here, the noteholders cannot take credit for reducing the length of the CG case. Michael W. O'Donnell of Columbia Gas System Service Corpo-

**556**

ration convincingly testified that CG and its professionals were the primary architects of the ultimate compromises, including the forms of currency, that were incorporated into the plan of reorganization. *E.g.,* Case no. 91–803, docket no. 5328 at 92, 94–95. Thus, the noteholders have not proven that they were responsible for the compromise.

Finally, the application fails to satisfy another element of the *Lebron* standards. Metropolitan Life and Teachers were the two largest holders of borrowed money claims. They held about $262.5 million in claims. Specifically, Metropolitan Life and Teachers held instruments in all of the varying types of debt issues. Case no. 91–803, docket no. 5328 at 15. It was because of the pervasive monetary positions held by Metropolitan Life and Teachers that the noteholders "were acting in a sense for all of those constituencies ." *Id.* at 12; *see also id.* at 26, 96. Thus, this is a situation where the noteholders' activities primarily benefited their own interests and for that purpose, including the compromise in which they participated. Any additional benefit to the estate was incidental. The noteholders' other arguments are without merit. The noteholders did not provide a substantial contribution to the CG estate.

VII. *Conclusion*

There is no need to reach the debtors' other arguments, including the debtors' alternate request for the objected-to applications to be reviewed by a fee auditor. A judgment and order addressing the section 503(b) applicants in the TCo case, and a judgment and order addressing the section 503(b) applicants in the CG case, both in accordance with this Opinion, are attached.