

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-1998

# In Re: Chambers Dev

Precedential or Non-Precedential:

Docket 97-3145

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"In Re: Chambers Dev" (1998). *1998 Decisions.* Paper 119.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/119

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 22, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3145

IN RE: CHAMBERS DEVELOPMENT COMPANY, INC.,
        Petitioner

On Petition for a Writ of Mandamus from the
United States District Court for the Western
District of Pennsylvania

(Civil No. 92-509J)

Argued: June 13, 1997

Before: STAPLETON and McKEE, Circuit Judges, and
ROSENN, Senior Circuit Judge

(Opinion filed: May 22, 1998)

        MICHAEL R. COLE, ESQ. (Argued)
        DAVID FERNANDEZ, ESQ.
        GREGORY BEVELOCK, ESQ.
        Riker, Danzig, Scherer, Hyland
        & Perretti LLP
        Headquarters Plaza
        One Speedwell Avenue
        Morristown, NJ 07962-1981

        Attorneys for Petitioner

        BENJAMIN CLARKE, ESQ. (Argued)
        JONATHAN L. WILLIAMS, ESQ.
        DeCotiis, Fitzpatrick & Gluck
        500 Frank W. Burr Boulevard
        Teaneck, New Jersey 07666

        Attorneys for Respondent,
        Passaic County Utilities Authority

OPINION OF THE COURT

McKEE, Circuit Judge.

Chambers Development Company, Inc., petitions for a writ of mandamus following our remand in Chambers Development Co., Inc., v. Passaic County Utilities Authority, 62 F.3d 582 (3d Cir. 1995) ("Chambers I"). Chambers argues that mandamus is necessary because the district court ignored that mandate. We agree, and will therefore grant a writ of mandamus and remand this matter once again for proceedings consistent with this opinion.

I.

When this matter was initially before us we observed that "[t]he parties and the court . . . plunged into a procedural miasma which is virtually impenetrable." 621 F.3d at 583. The case is now more confused than ever. It has evolved from miasma to a jurisprudential Rubik's cube, becoming more jumbled at each turn. The dispute arises from a breach of contract action between Chambers and Passaic County Utilities Authority ("PCUA"). We detailed the intricacies leading up to the dispute in Chambers I. We will now summarize the background only insofar as is necessary to resolve the issues raised by the mandamus petition before us.

In 1987, Chambers and PCUA entered into a contract for Passaic County's waste disposal. The contract was divided into three parts: an Agreement for the Grant and Acquisition of a License ("Initial Agreement"); a Long-Term Agreement for the Grant and Acquisition of a License for

2

Ash Residue Waste Disposal ("Long-Term Agreement"); and an Easement and License Agreement. The Initial Agreement governed the rights and duties of the parties from December 1, 1987, until December 1, 1992. The Long-Term Agreement governs the rights and duties of the parties from December 1, 1992 until December 1, 2002.

The Initial Agreement required PCUA to deposit all of its municipal solid waste ("MSW") in Chambers' landfills in Pennsylvania and required Chambers to reserve airspace for up to a maximum of 2.25 million tons of MSW in the first five year period. PCUA paid Chambers $51,225,000 in advance for its first period disposal rights. Performance of the Initial Agreement is not in dispute.

The Long-Term Agreement covered ash residue waste and non-processible and bypass solid waste generated by a mass burn incinerator or "resource recovery facility" ("RRF") that PCUA originally intended to have in place by 1992. However, construction of the RRF was not a condition precedent to either party's obligations under the Long Term Agreement. The Long-Term Agreement also provided that Chambers' landfills would serve as the primary disposal site for all solid waste for any period in which the RRF was not in operation. As it happened, the New Jersey Department of Environmental Protection and Energy ("NJDEPE") disapproved PCUA's proposed construction of an RRF and PCUA has no plans to construct one in the foreseeable future. However, the only significance of the cancellation of the RRF was that Chambers would be receiving ordinary MSW rather than receiving ash and by-pass waste.

New Jersey's environmental law required that NJDEPE approve the contract with Chambers. Accordingly, on June 24, 1987, Passaic County adopted Plan Amendment 4-1987 which sought approval of the County's Plan to:

> include the Chambers Development Company, Inc., landfill system in Pennsylvania and other states, to be utilized as primary landfills for the disposal of Passaic County solid waste from 1987 to 1992. In addition, this landfill system is designated under the plan as the primary landfill system for the disposal of ash, bypass

3

and non-processible waste associated with the operation of the resource recovery facility in the City of Passaic from the time the facility is operational until the year 2002.

On September 1, 1987, the Commissioner of NJDEPE, Richard T. Dewling, certified Passaic County's Plan Amendment 4-1987 in part (hereinafter "Dewling Certification"). Dewling approved the use of Chambers' landfills from 1987 through 1992. However, he rejected PCUA's plan to rely on Chambers' landfills as the primary site for waste disposal between 1992 and 2002 because the Plan's dependence on an out-of-state landfill for long-term solid waste disposal was contrary to Passaic County's obligation to develop in-county facilities for waste disposal.

Commissioner Dewling explained:

N.J.S.A. 13:1E-21(b)3 places a legal obligation on each district to plan for sufficient available suitable in-county disposal sites. . . . [T]he only solution to the long-term disposal needs of Passaic County is the development of in-county facilities or to secure interdistrict agreement with other New Jersey counties. In light of these factors, and [to] the extent that Passaic County has failed to meet its planning obligations pursuant to N.J.S.A. 13:1E-21(b)3, the Department cannot approve primary dependence upon out-of-state residual disposal capacity for the period 1993 to 2002.

*******************************

Amendment 4-1987 is hereby modified and approved to include within the district plan the designation of the Chambers Development Company, Inc., landfill system to Pennsylvania and other states as a component of Passaic County's contingency plan for the disposal of ash, by-pass and non-processible waste associated with the operation of the Passaic County resource recovery facility from the time the facility is operational until the year 2002. Further, within forty-five days of the date of this certification, Passaic County is directed to submit the remainder of its solid waste contingency plan in plan amendment form for state level review in consideration of the Department's comments of May 7,

4

1987 concerning the county's draft submission. More specifically, the remainder of the plan should address in-county residual landfill development, the development of interdistrict agreements on an interim/emergency basis, and the identification of alternate land filling options.

From 1987 through 1992, PCUA utilized Chambers' landfills as Passaic County's primary solid waste disposal site in accordance with the fully approved Initial Agreement. Apparently, during most of the period of the Initial Agreement, Passaic County never proposed any subsequent plan amendment or attempted to remedy the deficiency identified by Commissioner Dewling. Consequently, PCUA had no in-state primary plan to present to NJDEPE despite the approach of the end of the Initial Term of the agreement with Chambers.

In early 1992, PCUA began soliciting interest from disposal companies including Chambers, for a new 15-year disposal agreement which would handle the county's municipal waste. In addition, PCUA asked Chambers to renegotiate the disposal rates set forth in the Long-Term Agreement. Although renegotiations did begin, they proved fruitless.

On August 15, 1992, PCUA entered into a Memorandum of Understanding ("MOU") with Empire Sanitary Landfill, Inc. Under the MOU, PCUA agreed to deliver all Passaic County solid waste to Empire's landfill in Eastern Pennsylvania for a period of 15 years. The Empire MOU, like the prior agreement with Chambers, was subject to the review, amendment and approval of NJDEPE.

While the Passaic County Freeholders and PCUA were preparing to submit the Empire MOU to NJDEPE, Chambers learned of the Empire MOU and filed a complaint in the district court for the Western District of Pennsylvania seeking to enjoin the PCUA from proceeding with Empire. Chambers alleged that the MOU amounted to an anticipatory breach by PCUA of the Long Term Agreement it had with Chambers. Chambers also alleged that PCUA was equitably estopped from entering into a contract with Empire.

5

Chambers and PCUA filed cross-motions for summary judgment. The PCUA's motion was based on its argument that the Dewling Certification was a rejection of the Long-Term Agreement and that PCUA was free to explore alternative landfill options pursuant to the directive contained in Commissioner Dewling's certification.

On November 20, 1992, the district court granted summary judgment in favor of Chambers on its anticipatory breach of contract claim. The district court held that the Long-Term Agreement's validity did not depend upon whether the RRF was ever built. It then held:

> Because use of Chambers' landfills is approved as a contingency, and because NJDEPE has approved no other plan for disposal of solid waste in the 1992-2002 period, PCUA is obligated both under its Long-Term Agreement and under New Jersey state law to continue to use Chambers' landfills.

(November 11, 1992 Dist. Ct. Opn. at 9). The district court noted that no damages for breach had occurred because the Long-Term Agreement was not to take effect until December 1, 1992, and it granted a permanent injunction, with the following caveat:

> This Court cannot and is not attempting, by issuance of a permanent injunction, to bind NJDEPE, which has the statutory duty to regulate the disposal of solid waste in New Jersey. NJDEPE approved the use of Chambers' landfill as a contingency for the period 1992-2002 and there is nothing of record to indicate that until November 6, 1992[1], PCUA has attempted to obtain approval for any other method of disposal. Absent a contrary direction from NJDEPE, Passaic County is bound to honor its contract with Chambers. [2]

_____

1. November 6, 1992 is the date when PCUA submitted the MOU with Empire to NJDEPE for approval.

2. Since the district court clearly stated that its order could not be interpreted to bind the NJDEPE to take any action, the doctrine of primary jurisdiction is not implicated here. See MCI v. Teleconcepts, Inc., 71 F.3d 1086 (3d. Cir. 1995).

Accordingly, the court worded its injunctive order as follows:

> [A] permanent injunction is granted to Plaintiff, Chambers Development Corporation and against Defendant, Passaic County Utilities Authority. Unless and until directed to the contrary by a valid certification of the [NJDEPE], PCUA shall continue operating under the terms and conditions of the Long-Term Agreement for the grant and acquisition of a license of ash residue waste disposal. Provided, however, that nothing in this order shall be construed as restricting any proceeding by any party before NJDEPE seeking approval or disapproval of any primary long-term plan for the disposal of municipal solid waste by PCUA.

The district court entered summary judgment in favor of PCUA on Chambers' equitable estoppel claim because Chambers could not demonstrate reasonable reliance.

> [A]ny reliance by Chambers on the Long-Term Agreement being the primary solid waste disposal plan for the entire 1992-2002 period is unreasonable. Chambers, as a sophisticated corporation involved in negotiations with two governmental entities, could not rely on the contingent approval of the Long-Term Agreement as the equivalent of primary approval.

Neither party appealed any portion of the district court's November 20, 1992 decision.

Before the district court issued its injunction, NJDEPE notified PCUA that it had not yet come forward with an in-state, primary disposal solution. Commissioner Scott Weiner wrote:

> Passaic County currently has no disposal plan in place and the long-term use of out-of-state disposal was authorized only within the context of contingency plan backup use as stated within the Department's September 1, 1987 certification. Therefore, the Passaic County Plan is deficient with respect to N.J.S.A. 13:1E-21(b)3.

7

Despite this reminder that it was not in compliance with the requirement for an in-state disposal facility, PCUA submitted the Empire MOU to NJDEPE for review and approval on November 6, 1992. On December 7, 1992, the Commissioner of NJDEPE formally ordered PCUA to:

> Submit to the Department all supporting documents with respect to its proposed plan certification including the Memorandum of Understanding and contract with Empire as well as the long-term disposal strategy previously required by the Department's September 11, 1992 Plan Certification and any other justifications to support this contract by January 9, 1992.

On the same day, the Commissioner extended the Chambers arrangement for one year until the regulatory process was completed, and PCUA executed a contract with Empire.

On or about December 4, 1992, Chambers filed an application for post judgment relief with the district court seeking a temporary restraining order against PCUA's approval of a contract with Empire. In an Order, dated February 1, 1993, the district court denied the restraining order, but indicated that it would entertain a motion seeking the revocation of PCUA's action or another remedy. While Chambers was proceeding on its "post-judgment" actions, PCUA was proceeding with the approval process with NJDEPE for the Empire Contract. On December 17, 1992, Passaic County submitted a Verified Petition to NJDEPE seeking approval of Empire as Passaic County's primary disposal plan. In seeking that approval, PCUA took the position that Commissioner's Dewling Certification approved Chambers "only as a contingency plan in the absence of any other disposal strategy approved by the DEP."

On April 8, 1993, NJDEPE agreed to review the Empire arrangement, contingent upon PCUA also submitting a long-term, in-state disposal plan. On August 20, 1993, PCUA participated in a status conference with the then Acting Commissioner of NJDEPE, Jeanne M. Fox. At that conference, PCUA stated that "[t]here is no existing out-of-state contract [with Chambers] and that fact has been

8

recognized by Passaic County in its submission of this new plan."

On October 7, 1993, Commissioner Fox approved PCUA's proposal to designate Empire's out-of-state landfill as Passaic County's primary disposal mechanism. In approving the Empire arrangement, Commissioner Fox stated: "In comparison to the Chambers' Agreement, the Empire Agreement offers significant savings in the form of avoided costs for the transportation and disposal of municipal waste." The Commissioner also wrote that the Chambers-PCUA Long-Term Agreement "was merely a contingent arrangement which, for Department purposes, never took effect." Nonetheless, the Commissioner did indicate that the Long-Term Agreement was not a completely dead issue. She wrote: "If . . . legislation is imposed which renders the Empire Agreement void or voidable, the Chambers Long-Term Agreement contingency plan can be activated, pending the institution of the in-state long-term disposal solution."

Chambers did not seek to have PCUA's contract with Empire rescinded as suggested in the district court's February 1, 1993, Order. Instead, Chambers filed a supplement to the previous summary judgment motion contending that execution of the MOU and contract with Empire constituted an actual, rather than an anticipatory, breach of contract and a breach of the covenant of good faith and fair dealing. Chambers argued that the law of the case was that the Long-Term Agreement had been declared a binding and enforceable contract and that in order to comply with the district court's order, PCUA was required to seek approval of the Chambers-PCUA Agreement, not present a competing contract to NJDEPE for approval. This time Chambers sought damages in the amount of its expected lost profits from the balance of the Chambers-PCUA contract.

PCUA responded that the Initial Agreement was the law of the case as it was the only plan approved by NJDEPE, and the district court's order gave it the right to seek NJDEPE approval of the Empire plan.

The matter was referred to a magistrate judge whofiled a Report and Recommendation in which he recommended

9

that Chambers' motion for summary judgment be denied and that summary judgment be granted in favor of PCUA even though PCUA never moved for summary judgment.

On June 29, 1994, the district court adopted the Report and Recommendation of the magistrate judge. However, while adopting the magistrate's report and recommendation, the district court wrote:

> [I]f there were evidence in the record to support Chambers' . . . assertion that "[PCUA], as late as 1992 indicated that the contract would be performed on a long-term basis". . . I would find that New Jersey precedent on the scope of the duty of good faith required a hearing into whether the [PCUA] breached a duty of good faith performance of its contract with Chambers.

Chambers responded to this statement by filing a motion under Fed. R. Civ. P. 59(e) seeking to amend the judgment so as to order an evidentiary hearing on the duty of good faith performance. That motion was denied on July 19, 1994, and Chambers appealed. (Chambers I).

II.

In Chambers I, a panel of this court unanimously concluded that the district court's grant of summary judgment to PCUA was improper because PCUA had never moved for summary judgment. Id. at 584. The panel majority also agreed that "there are unresolved material issues of fact regarding [PCUA's] obligations under the Chambers unaltered and unrescinded long-term agreement which can only be resolved by an evidentiary hearing." Id. at 588. The majority noted that, while the long-term agreement did not expressly state that it was subject to the approval of NJDEPE, it nonetheless could not be implemented unless NJDEPE approved PCUA's amended plan. Id. Since NJDEPE did not approve PCUA's plan "in toto", the Dewling Certification was "enigmatic" and "left the meaning of the Chambers Long-Term Agreement susceptible to more than one interpretation." Id. Accordingly, we vacated the district court's grant of summary judgment and remanded "for further proceedings

10

consistent with this opinion, with the privilege to Chambers to amend its complaint to enable it to present the case in its current status." Id., at 589. In doing so, we instructed the district court as follows:

> On remand, the district court should first determine the effect of the [Dewling Certification] on the Chambers long-term agreement. In connection, it should ascertain whether the Authority evinced an understanding that the Chambers long-term agreement was still binding by commissioning the 1991 Alaimo report and other similar reports.3 It should also determine as a fact that the Authority's purpose in filing its complaint in the New Jersey State Court and whether it supported Chambers' contention that it and the Authority knew they had a binding contract in place, subject only to the Authority's compliance with [NJDEPE] certification.4 Finally, the court must factually determine whether the Authority was

_____

3. According to Chambers, PCUA required that Chambers formally certify, on an annual basis, that its facilities could accommodate the volume of solid waste contemplated by the full fifteen-year term of the contract. Chambers claims that it has done so. In any event, in 1991, PCUA challenged the certifications and an independent consultant, Alaimo Engineering, was retained to perform a study. The report sought to determine the capacity of the Chambers landfills. The Report was prepared for PCUA and it clearly shows that it covered the time period from 1987 to 2002, the time period of both the Initial Agreement and the Long-Term Agreement. Chambers argued that the Alaimo report demonstrates that PCUA expected to use Chambers for waste disposal after the short-term contract expired. PCUA did not address this argument in the appeal.

4. In September, 1992, PCUA filed a state court declaratory judgment action, naming as defendants Chambers, Empire and NJDEPE, seeking a declaration that it is not liable to perform under the contract after 1992 if such performance is due to the existence of a later-approved primary disposal alternative; declaring that PCUA may terminate its contract with Chambers upon payment of damages in accordance with section 9.3 of the contract; and restraining Chambers from interfering with PCUA's obligation to secure contractual arrangements to provide safe, adequate and economical services to its ratepayers and citizens. Chambers argued that this action demonstrates that PCUA believed that its contract with Chambers was valid and enforceable.

11

attempting to disengage itself from obligations under its long-term contract with Chambers because in 1992 it could secure a contract with Empire at better prices and whether it violated the covenant of good faith and fair dealing in so doing.

Id.

III.

On remand, Chambers filed a two count amended complaint per our opinion. App. at 26-40. Count One alleged that the Dewling Certification directed PCUA to identify a New Jersey disposal facility by 1992 and approved Chambers as the contingent alternative in the event PCUA failed to identify an in-state disposal facility. Chambers averred that, by choosing to perform with these qualifications, PCUA assumed a contractual obligation to use Chambers as the exclusive out-of-state alternative. Count Two alleged that PCUA breached the duty of good faith and fair dealing by convincing NJDEPE to approve the Empire contract, thus destroying the fruits of the Chambers-PCUA contract.

PCUA eventually filed a motion for summary judgment in which it argued that Chambers' amended complaint must be dismissed on the basis of judicial estoppel. The judicial estoppel argument had two facets. PCUA first argued that Chambers had asserted inconsistent positions in two separate lawsuits. In a lawsuit against another utility authority involving a Chambers competitor, Chambers had argued that the contract in question was invalid because it was made in the absence of public bidding.5 The Chambers-

_____

5. According to PCUA, in January of 1994, Chambers began suit against a competitor, Waste Management of Pennsylvania, Inc., in New Jersey state court, seeking to invalidate a long-term ash disposal contract between Waste Management and the Essex County Utilities Authority. Chambers contended that under New Jersey law, county utility authorities are required to adhere to public-bidding procedures in awarding any long-term ash disposal contracts. Thus, argued Chambers, because the Essex County-Waste Management contract was awarded without public bidding, it was illegal and void. Chambers prevailed in the trial court and the parties ultimately agreed to dismiss an appeal filed with the New Jersey appellate court.

12

PCUA contract was also reached without public bidding, and PCUA asserted that Chambers should therefore be judicially estopped from asserting the validity of its "contract" with PCUA. Second, PCUA argued that the amended complaint should be dismissed because Chambers had represented that it was not seeking interpretation of the Dewling Certification in an earlier phase in the lawsuit. PCUA argued that Count One of Chambers' amended complaint did exactly that and it should therefore be dismissed.

The summary judgment motion was referred to the magistrate judge, who recommended that Count One of the amended complaint be dismissed under the doctrine of judicial estoppel. He concluded that Chambers had previously represented that it was not seeking to have the court interpret the Dewling Certification, but that Chambers' amended complaint sought just such an interpretation. Id. at 7-8. The magistrate judge rejected the first judicial estoppel argument, because the validity of the agreement had already been established by the district court and was thus the law of the case.

However, the magistrate judge went even further. He ruled that Count One should be dismissed "as barred by the plain meaning of the 1987 certification." Id. at 8 n.7. The magistrate judge opined that the Dewling Certification "did not give Chambers an exclusive contract in the 1992-2002 period" as the out-of-state alternative. Id., at 3 n.2.

The district court adopted the Report and Recommendation as its opinion and entered an order dismissing Count One of the amended complaint. As a result, only the breach of good faith claim asserted in Count Two remained. Thereafter, the district court denied requests by both Chambers and PCUA to certify the matter for immediate interlocutory appeal pursuant to 28 U.S.C. S 1292(b). Once again, the district court referred the matter to the magistrate judge, who recommended that certification be denied, and reiterated his view that the "plain meaning of the Dewling Certification precludes the claim asserted in Count One." February 11, 1997 Report and Recommendation at 1. He stated:

13

Neither side sets forth any evidence they have obtained in discovery, evidence they have sought in discovery, or any suggestion as to what evidence might exist that would allow a court to construe Dewling's certification in any manner other than by examining the four corners of the certification.

Id.

This Report and Recommendation was also adopted by the district court. Thereafter, Chambers filed this petition for mandamus, asserting that the district court's holding that the "plain meaning of the Dewling Certification" precludes its breach of contract action ignored our mandate in Chambers I.

IV.

We have authority to issue writs of mandamus pursuant to the All Writs Act, 28 U.S.C. S 1651(a). Hahnemann University Hospital v. Edgar, 74 F.3d 456, 460 (3d Cir. 1996). That Act states "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. S 1651(a). Traditionally, the writ of mandamus has been used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Will v. Calvert Fire Ins. Co., 437 U.S. 655, 661 (1978). The writ is a drastic remedy that "is seldom issued and its use is discouraged." Lusardi v. Lechner, 855 F.2d 1062, 1069 (3d Cir. 1988). Moreover, it is within a court's discretion to refrain from issuing the writ even when the requirements for mandamus are technically satisfied. The availability of the writ "does not compel its exercise." Id. at 1070.

The writ of mandamus is a drastic remedy that a court should grant only in extraordinary circumstances in response to an act amounting to a judicial usurpation of power. Given its drastic nature, a writ of mandamus should not be issued where relief may be obtained through an ordinary appeal. Thus, in addition to the jurisdictional prerequisite inherent in the language of

14

section 1651(a),6 two additional prerequisites for issuance of a writ are: (1) that petitioner have no other adequate means to attain the desired relief, and (2) that petitioner meets its burden of showing that its right to the writ is clear and indisputable. Even when these prerequisites are met, issuance of the writ is largely discretionary, bearing in mind the unfortunate consequence of making the judge a litigant.7

Hahnemann University Hospital v. Edgar, 74 F.3d at 462 (citations and internal quotations omitted).

Nonetheless, in appropriate circumstances, the issuance of the writ is the "obvious" remedy. Blasband v. Rales, 979

_____

6. Under the All Writs Act, the writ of mandamus can be issued where "necessary or appropriate in aid of [the court's] jurisdiction." 28 U.S.C. S 1651(a). However, to satisfy the jurisdictional prerequisite, it is not necessary that the action in which the writ is sought be pending in the court asked to issue the writ. United States v. Christian, 660 F.2d 892, 894 (3d Cir. 1981). Rather, it is only required that the case may at some future time come within the court's appellate jurisdiction. Id. Here, the district court has diversity jurisdiction over the underlying breach of contract action and, therefore, this court "potentially has jurisdiction over the case and therefore has jurisdiction under the All Writs Act to consider" Chambers' petition for a writ of mandamus. Hahnemann University Hospital v. Edgar, 74 F.3d at 460.

7. The "unfortunate consequence of making the judge a litigant" is no longer a factor to be considered in exercising our discretion whether to grant the writ. The 1996 amendments to Fed. R. App. P. 21 eliminated the role of the district court judge as a respondent. The Advisory Committee Notes to the 1996 amendments provide:

> In most instances, a writ of mandamus . . . is not actually directed to a judge in a more personal way than is an order reversing a court's judgment. Most often a petition for a writ of mandamus seeks review of the intrinsic merits of a judge's action and is in reality an adversary proceeding between the parties. See, e.g., Walter v. Columbia Broadcasting System, Inc., 443 F.2d 33 (7th Cir. 1971). In order to change the tone of the rule and of mandamus proceedings generally, the rule is amended so that the judge is not treated as a respondent.

However, the court of appeals can "invite or order the trial judge to respond," and the trial judge "may request permission to respond. . . ." Fed. R. App. P. 21(b)(4).

F.2d 324, 328 (3d Cir. 1992). For example, mandamus is appropriate when a district court has failed to adhere to the mandate of an appellate court.8Id.; see also Delgrosso v. Spang & Co., 903 F.2d 234, 237 (3d Cir. 1990); Citibank, N.A. v. Fullam, 580 F.2d 82, 86-87 (3d Cir. 1978). Appellate courts "have uniformly granted such writs where .. . the district court has failed to adhere to an order of the court of appeals." Citibank, N.A. v. Fullam, 580 F.2d at 86-87.

> A federal district court has a clear duty to comply with an order decreed by a panel of this circuit. Where the district court has failed to comply with such an order, we have authority under S 1651 to issue a writ of mandamus to compel the district court to follow our previous order. Any other rule would severely jeopardize the supervisory role of the courts of appeals within the federal judicial system.

Id. Moreover, district courts "must implement both the letter and spirit of the mandate, taking into account [our] opinion and the circumstances it embraces." Delgrosso v. Spang & Co., 903 F.2d at 240. When we direct the district court "to act in accordance with [our] opinion . . . the

_____

8. The mandate of an appellate court establishes the law binding further action in the litigation by another body subject to its authority. Finberg v. Sullivan, 658 F.2d 93, 97 n.5 (3d Cir. 1981) (citation and internal quotations omitted). Functionally, the mandate is"the formal vehicle for conveying the terms of our disposition to the District Court." Clarke v. United States, 915 F.2d 699, 716 (D.C. Cir. 1990). As a procedural matter, the mandate is issued by the Clerk of Court and usually consists of a certified copy of the judgment, a certified copy of the opinion of the court, if any, and any directions as to costs. Fed. R. App. P. 41(a). Thus, the issuance of the mandate "is largely a ministerial function," Finberg v. Sullivan, 658 F.2d at 97 n.5, that follows automatically 7 days after the expiration of the time for filing of a petition for rehearing, unless stayed. Fed. R. App. P. 41(a). As a practical matter, "[f]or most purposes, the entry of judgment, rather than the issuance of the mandate, marks the effective end to a controversy on appeal." Finberg, at 97 n.5; see also Clarke v. United States, 915 F.2d at 716 ("[O]ur issuance of the mandate is wholly separate from our consideration of the merits. . . ."). Therefore, "our circuit recognizes the minimal role a court ordinarily plays between the filing of a decision and the issuance of a mandate." Humphreys v. Drug Enforcement Administration, 105 F.3d 112, 117 (3d Cir. 1996).

opinion becomes part of the mandate and must be considered together with it." Id.

Here, on remand, the district court held that the"plain meaning" of the Dewling Certification precludes Chambers' breach of contract claim. As noted above, in Chambers I, we held that the Dewling Certification "left the meaning of the Chambers long-term contract susceptible to more than one interpretation." Chambers, 62 F.3d at 588. To illustrate the ambiguity in the Certification we posed the following query:

> Did the certification mean that the Chambers contract would be effective in all its terms in the event PCUA failed to develop in-state waste disposal options? Or did it mean the certification effectively rendered the long-term agreement a nullity permitting it to be replaced at the will and whimsy of the Authority? This ambiguity creates questions of fact susceptible to more than one meaning which preclude summary judgment. Therefore, extrinsic evidence that objectively will illuminate its meaning, especially the conduct of the parties, will be helpful.

Id. (emphasis added). We instructed the district on remand to "first determine the effect of the [Dewling Certification] on the Chambers long-term agreement" and to "ascertain whether the [PCUA] evinced an understanding that the Chambers long-term agreement was still binding by commissioning the 1991 Alaimo report and other similar reports." Id. at 589. It should be obvious that, had we concluded that the contract could be enforced as a matter of law with no extrinsic evidence as to intent, we would not have held as we did. On the contrary, we determined that the Dewling Certification was ambiguous and that extrinsic evidence was necessary to determine its meaning insofar as the Long Term Agreement between Chambers and PCUA was concerned. Despite that holding, the district court ruled that the "four corners of the [Dewling] certification," were so clear as to bar Chambers' breach of contract claim as a matter of law. That holding is so clearly contrary to our mandate that very little further discussion is required. Thus, in the usual situation, we could end our analysis having concluded that the district court ignored both the letter and spirit of our mandate.

This is not, however, the usual situation, and we must go further if we are to properly align the facts in this "cube." The district court dismissed the breach of contract action on the alternative theory of judicial estoppel. In fact, the Report and Recommendation that the district court adopted relied almost exclusively upon that doctrine to justify the dismissal of Count One. The magistrate judge stated:

> PCUA is correct in asserting that judicial estoppel requires dismissal of Count One of the Amended Complaint on grounds other than Chambers' assertion in New Jersey state court that solid waste disposal contracts require public bidding. To avoid dismissal or transfer of this matter, Chambers represented to the Court that it was not seeking interpretation of Commissioner Dewling's 1987 certification of the Short–Term Agreement and contingent approval of the Long–Term Agreement in a manner that would obstruct the NJDEPE from determining where Passaic County's solid waste should go in the 1992–2002 period. Count One of the Amended Complaint asks exactly that. Chambers should be held bound by its representations, and the Court should dismiss Count One of the Amended Complaint.

December 11, 1996 Report and Recommendation at 7–8. The magistrate judge's erroneous conclusion that the Dewling Certification could be enforced as a matter of law was discussed in only two footnotes. See Id. at 3 n.2 and 8 n.7; see also February 11, 1997 Report and Recommendation at 1.

It is "axiomatic" that, on remand for further proceedings, the "trial court must proceed in accordance with the mandate and law of the case as established on appeal." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985). However, our mandate does not prohibit the district court from considering new issues raised after remand. A district court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Id. at 950. Therefore the district court was "free to make any order or direction in further progress of the case, not inconsistent with [our] decision . . . as to any question not settled by the decision"

18

on remand. Id. The doctrine of judicial estoppel was only asserted after our remand. Nevertheless, Chambers argues that the district court's ruling on judicial estoppel is inconsistent with our mandate and that we can therefore address the merits of that decision under our mandamus jurisdiction. Chambers' Br. at 30-32. Chambers relies upon the following language from Chambers I:

> The concurrence attaches some significance to DEP's 1993 approval of the Empire contract. This approval had no effect on the Authority's obligations under the Chambers long-term contract. DEP's approval of the Empire contract signifies only that the Empire contract conforms to the New Jersey waste disposal plan.

Chambers, 62 F.3d at 588 n.13. In contrast, the district court adopted the following statement of the magistrate judge:

> For a Court to tell a party that despite the real world approval of the Empire Agreement by the NJDEPE the NJDEPE is judicially deemed to have approved Chambers interferes with the validity of the operations of the NJDEPE every bit as much as injunctive relief, since it essentially tells the solid waste authorities that NJDEPE certification is worthless unless approved by the court.

December 11, 1996, Report and Recommendation, at 8 n.8. Chambers now argues that this statement is inconsistent with our conclusion that its breach of contract claim does not interfere with NJDEPE's approval of the PCUA-Empire contract. However, we can not address Chambers' argument unless it comes within our mandamus jurisdiction.

A.

Our jurisdiction to review the propriety of the district court's grant of summary judgment on a petition for a writ of mandamus is a difficult question. Since the court granted summary judgment on Count One of Chambers' amended complaint, Count Two (breach of good faith and fair dealing) remains. Mandamus is an appellate power,

19

that is "realistically a form of interlocutory appeal," Martin v. United States, 96 F.3d 853, 854 (7th Cir. 1996). However, it is "different in kind from an appeal." Madden v. Myers, 102 F.3d 74,77 (3d Cir. 1996). Mandamus "constitutes a procedural mechanism through which a court of appeals reviews a carefully circumscribed and discrete category of district court orders." Id. In distinguishing between mandamus and appellate jurisdiction, we have said:

> The practical difference between appellate jurisdiction and mandamus jurisdiction is the standard of review. Our standard of review under mandamus jurisdiction is exceedingly narrow; our standard of review under appellate jurisdiction varies depending on the issue that we are called upon to review. Accordingly, mandamus jurisdiction affords an appellate court less opportunity to correct district court error in the case before it and less opportunity to provide guidance for future cases. Moreover, comity between the district and appellate courts is best served by resort to mandamus only in limited circumstances. Review under appellate jurisdiction is therefore preferable to review under mandamus jurisdiction.

In re Ford Motor Co., 110 F.3d 954, 964 (3d Cir. 1997)(citation omitted). Thus, mandamus is not a substitute for appeal and a writ of mandamus will not be granted if relief can be obtained by way of our appellate jurisdiction. Id. at 957. Mandamus is "disfavored because its broad use would threaten the [congressional] policy against piecemeal appeals." In re School Asbestos Litigation, 977 F.2d 764, 772 (3d Cir. 1992)(citing Kerr v. United States District Court, 426 U.S. 394, 403 (1976). 9 Here, the

_____

9. For example, discovery orders are generally not appealable, Smith v. BIC Corp., 869 F.2d 194, 198 (3d Cir. 1989). Therefore, mandamus is the appropriate jurisdictional vehicle to review disclosure of documents and information when privilege is asserted. See Rohne-Poulenc Rorer Inc. v. Home Indemnity Co., 32 F.3d 851, 861 (3d Cir. 1994) (discussing privilege or other interests of confidentiality); Haines v. Liggett Group, Inc., 975 F.2d 81, 89 (3d Cir. 1992) (discussing attorney-client privilege and work product doctrine protections); Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1422 (3d Cir. 1991)(same);

grant of summary judgment was interlocutory and notfinal
within the meaning of 28 U.S.C. S 1291. See Communication
Workers of America, AFL-CIO v. American Telephone &
Telegraph Co., 932 F.2d 199, 205 (3d Cir. 1991) ("[A]
decision is final within section 1291 when it ends the
litigation on the merits and leaves nothing for the court to
do but execute the judgment.").10 Further, the district court

_____

Sprock v. Peil, 759 F.2d 312, 314-15 (3d Cir. 1985)(discussing work
product doctrine protections); Bogosian v. Gulf Oil Corp., 738 F.2d 587,
591 (3d Cir. 1984)(same); see also Hahnemann Univ., 74 F.3d at 461
(discussing possible mandamus jurisdiction to review claim that
documents were protected by, inter alia, a state law psychotherapist-
patient privilege); Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483-84
(3d Cir. 1995) (discussing mandamus jurisdiction over review of terms of
a protective order); Smith v. BIC Corp., 869 F.2d at 198-99 (discussing
the collateral order doctrine in the context of a review of a claim that
disputed documents contained trade secrets requiring protection);
Cippolone v. Liggett Group, Inc., 822 F.2d 335, 340 (3d Cir. 1987)
(discussing mandamus jurisdiction over review of a protective order).

We have exercised mandamus jurisdiction over privilege and work
product issues because we have found that "appealing [those] issues
after final judgment is ineffective," In re Ford Motor Co., 110 F.3d at
962,
for the simple and obvious reason that "compliance with the production
orders . . . destroys the right sought to be protected." Bogosian, 738
F.2d
at 591. In other words, mandamus review is appropriate because,
without it, the petitioner has no other remedy.

Recently, we have adopted the view that we do have appellate
jurisdiction over attorney-client privilege and work product doctrine
protection issues under the collateral order doctrine. In re Ford Motor
Co., at 964. Nonetheless, our decision in Ford Motor Co. makes it clear
that mandamus remains an appropriate jurisdictional mechanism to
review orders compelling the disclosure of privileged and confidential
information. Id.; see also Smith v. BIC Corp., 869 F.2d at 198 (holding
that discovery orders can, assuming the respective requirements are
met, be reviewed either under the collateral order doctrine or by way of
a petition for a writ of mandamus).

10. Both Chambers and PCUA agree that Count Two of the amended
complaint remains outstanding. Nonetheless, we have a conceptual
problem in understanding how a count alleging a breach of good faith
and fair dealing, which is inherent in the contract claim, can survive a
finding that the breach of contract claim is barred by the plain meaning

21

declined to certify the summary judgment order as to Count One for immediate interlocutory appeal pursuant to 28 U.S.C. S 1292(b). The district court's order dismissing Count One is not a collateral order under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949), and its progeny.[11] Moreover, Chambers has an adequate remedy. It can seek appellate review of the judicial estoppel ruling when Count Two is finally adjudicated. The only consequence of our refusal to review the dismissal of Count One now is that Chambers will incur further expense and delay if it were to prevail in an appeal of the judicial estoppel ruling following resolution of Count Two. We have never rested the exercise of our jurisdiction upon such inconvenience. Standing alone, Chambers' inconvenience does not justify our review of the summary judgment decision on a petition for mandamus. Mandamus is generally an inappropriate vehicle to review the district court's denial of a summary judgment motion because the litigation continues. Communication Workers of America, 932 F.2d at 210.

Admittedly, Chambers faces the reverse of the situation faced by the petitioner in Communication Workers. Chambers seeks mandamus relief from an order granting summary judgment to PCUA on one of its claims, while the petitioner in Communication Workers, sought review of an order denying its motion for summary judgment. However,

_____

of the Dewling Certification and by judicial estoppel. The obligation to deal in good faith arises out of the underlying contract. Thus, if the breach of the underlying contract claim no longer survives, we are at a loss to understand how the duty to deal in good faith survives independently of the breach of contract action. However, Chambers does not argue that this dismissal of Count One was tantamount to a final order dismissing the entire contract action. Thus, we do not consider this conceptual problem here.

11. The collateral order doctrine "provides a narrow exception to the general rule permitting appellate review only offinal orders. An appeal of a nonfinal order will lie if (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment." In re Ford Motor Co., 110 F.3d 954, 958 (3d Cir. 1997).

for purposes of our jurisdictional analysis here, that is a distinction without a difference. The order before us, and the one at issue in Communication Workers, are both interlocutory in nature. Hence, the general policy against granting mandamus review to an order denying a motion for summary judgment applies with equal force here. Normal appellate review is available upon the completion of this litigation.

We did review a district court's denial of a summary judgment motion in a petition for mandamus in In re Asbestos School Litigation, 46 F.3d 1284 (3d Cir. 1994). There, petitioner asserted that the district court's denial of its motion for partial summary judgment "has caused and is continuing to cause irreparable harm to its First Amendment rights." Id. at 1286. We relied upon N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 (1982), to hold that the petitioner could not, "consistent with the First Amendment," be held liable. Id. Accordingly, we held that the district court's denial of Pfizer's partial summary judgment motion was "clearly in error," and found that the issuance of a writ of mandamus was "appropriate to prevent the harm to First Amendment rights that would occur if review . . . had to wait until a final judgment" is entered. Id.

Chambers does not, and cannot, claim that any constitutional right is being impaired by the district court's judicial estoppel decision. Thus, the extraordinary circumstances present in In re Asbestos School Litigation are not present here. In fact, in In re Asbestos School Litigation we reaffirmed our general rule that mandamus is not the appropriate mechanism for review of a district court's denial of a motion for summary judgment. Id. at 1295. We expressly noted Asbestos School Litigation was "dramatically different" from Communication Workers because in Communication Workers, our refusal to subject the denial of the summary judgment motion to mandamus review merely required AT&T to go to trial, while in Asbestos School Litigation, a refusal to grant mandamus review "would subject [petitioner] to a continuing impairment of its First Amendment freedoms." Id.

23

Nevertheless, despite our narrow scope of review under mandamus, and despite the interlocutory nature of the district court's judicial estoppel ruling, we conclude that it is both appropriate and necessary that we address the propriety of the district court's judicial estoppel ruling now because that issue is an intrinsic component of the question that is properly before us on the mandamus petition. See Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964). In Schlagenhauf, the Court approved the use of mandamus to decide the "basic, undecided" question of whether a district court could order the mental and physical examination of a defendant under Fed. R. Civ. P. 35(a). At the time of that decision, Rule 35(a) provided as follows:

> In an action in which the mental or physical condition of a party is in controversy, the court in which the action is pending may order him to submit to a physical or mental examination by a physician. The order may be made only on motion for good cause and upon notice to the party to be examined and to all other parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Id. at 106.

Schlagenhauf was the driver of a bus and was named as one of a number of defendants in a diversity personal injury action in which passengers sought damages for injuries they sustained when the bus collided with the rear of a tractor-trailer. Upon a motion of the plaintiffs, the district court ordered Schlagenhauf to submit to mental and physical examinations. Schlagenhauf applied to the court of appeals for a writ of mandamus against the district court judge, seeking to have the order set aside. The court of appeals held that its mandamus power allowed it to decide whether a district court had the power to order a defendant to submit to a mental and physical examination. Id. In addition, the court of appeals examined the "in controversy" requirement of Rule 35 and determined it adversely to Schlagenhauf. However, the court held that it did not have the power to determine the "good cause" requirement of Rule 35, because it believed that it was not appropriate to

24

review that question on a petition for mandamus. Id. Therefore, the court of appeals declined to issue the writ of mandamus.

The Supreme Court concluded that the court of appeals could exercise mandamus review over the question of whether "good cause" had been shown for the examination though that question was not ordinarily within the scope of mandamus review. Id. at 111. The Court held that the "good cause" question was proper for mandamus review at that time because it was part of a case brought before the Court "on a substantial allegation of usurpation of power in ordering any examination of a defendant," and, therefore, should have been decided by the appellate court. Id. In short, the Court found that "the Court of Appeals had power to determine all of the issues presented by the petition for mandamus." Id. Indeed, the Court found that the court of appeals should have determined the"good cause" issue in order, not only to settle "new and important problems," but also "so as to avoid piecemeal litigation." Id.

Although Schlagenhauf is not "on all fours" with the circumstances before us, it is instructive. Here, the district court's judicial estoppel holding is so tethered to its disregard of our mandate that we can not remedy the latter without addressing the former. See 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE S 3934 (2d ed. 1996). As we discuss below, our mandate left no room for judicial estoppel as applied by the district court on remand. Accordingly, failure to address the propriety of the district court's judicial estoppel rationale would reduce the mandate we issued in Chambers I to a nullity and jumble this "cube" yet again with another turn in the wrong direction. Moreover, since the judicial estoppel issue would undoubtedly come before us after Count Two is resolved, we face the prospect that we will have these same parties before us for a third time, arguing an issue that is implicit in the mandamus petition now before us. See Schlagenhauf, 379 U.S. at 110 (special circumstances can extend mandamus power in order to avoid piecemeal litigation and resolve "new and important problems").

25

Accordingly, we will review the district court's judicial estoppel decision.12

B.

> Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts.

Ryan Operations, G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996) (citations and internal quotations omitted).13 The party asserting the estoppel is not required to demonstrate detrimental reliance upon the prior representation. Id. at 360. In addition, the party to be estopped need not have benefited from its earlier position. Id. at 361. However, the doctrine will not apply where inconsistent positions are asserted in good faith or through inadvertence.

> Asserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does

_____

12. Our review of the district court's grant of summary judgment is plenary. Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.), cert. denied, ___ U.S. ___, 116 S. Ct. 165 (1995). We note that our standard of review here does not contravene the general policy that mandamus is not the appropriate jurisdictional method to review a district court decision based on the exercise of discretion. United States v. Christian, 660 F.2d 892, 896 (3d Cir. 1981).

13. In Ryan Operations, G.P., one member of the panel noted that there is, apparently, a question as to whether state judicial estoppel law or federal judicial estoppel law applies in a diversity action. Here, the magistrate judge's Report and Recommendation recites that the New Jersey and the federal judicial estoppel rules are consistent. December 11, 1996 Report and Recommendation, at 5 n.4. Neither Chambers nor PCUA disputes that ruling. 81 F.3d at 359 n.2.

not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

Id. at 362 (citations and internal quotations omitted). The reason for so limiting the doctrine is straightforward. The doctrine is intended for those who "act with the intent to play fast and loose with the courts." Id. at 365.

Here, the magistrate judge wrote:

To avoid dismissal or transfer of this matter, Chambers represented to the Court that it was not seeking interpretation of Commissioner Dewling's 1987 certification of the Short-Term Agreement and contingent approval of the Long-Term Agreement in a manner that would obstruct the NJDEPE from determining where Passaic County's solid waste should go in the 1992-2002 period. Count One of the Amended Complaint asks exactly that. Chambers should be held bound by its representations, and the Court should dismiss Count One of the Amended Complaint.

December 11, 1996 Report and Recommendation at 8. There are two problems with the magistrate judge's conclusion. First, on the purely technical and procedural level, there are no findings that Chambers intentionally misrepresented its position so as to "play fast and lose with the court." For that reason alone, grant of summary judgment to PCUA was improper unless we assume that such findings are implicit in the court's ruling. However, under the facts sub judice, such a finding would be clearly erroneous because, as we will discuss, it is not supported by the record. Second, and more importantly, Chambers' position is in response to, and totally consistent with, our mandate in Chambers I.

The dispute over the "inconsistent" positions can be traced to a motion filed by PCUA in 1992 by which PCUA sought to dismiss Chambers' first complaint. PCUA argued, inter alia, that Chambers' failure to join NJDEPE as an indispensable party under Fed.R.Civ.P. 19 was fatal to its

27

claim. Chambers responded that NJDEPE was not an indispensable party because Chambers was not seeking the rejection or modification of any NJDEPE decision nor was Chambers seeking to affect NJDEPE's interest in the administration of its solid waste management planning system. The district court agreed with Chambers, found that NJDEPE was not an indispensable party, and dismissed PCUA's motion.

PCUA argues that Chambers once again assured the magistrate judge that it was not trying to second-guess NJDEPE or asking the court to interfere with NJDEPE's regulatory jurisdiction when Chambers filed its complaint seeking injunctive relief based upon PCUA's alleged anticipatory breach. PCUA argues that Count One of the amended complaint, filed after remand, specifically asked the court to interpret the Dewling Certification and, by so doing, asked the district court to interfere with NJDEPE's regulatory function. The district court agreed and dismissed Count One.

However, Count One does not implicate NJDEPE's regulatory authority. The relevant portion of Count One of the amended complaint provides as follows:

> 42. The Chambers Contract was a valid, binding contract when executed.
>
> 43. As executed, the Chambers contract obligated PCUA to deliver all Passaic County solid waste to the Chambers landfills for the final ten years of the Contract in the event no incinerator was constructed.
>
> 44. No incinerator was constructed.
>
> 45. The Dewling Certification amounted to a partial approval of the Chambers Contract, such that Chambers was designated as the exclusive out-of-state disposal facility for Passaic County solid waste during the final ten years of the Contract, and could only be replaced by a suitable in-state disposal facility.
>
> 46. The parties expressly and/or impliedly assented to Commissioner Dewling's modifications.
>
> 47. As modified by the Dewling Certification together with the parties' express and/or implied assent, the

28

Chambers Contract obligated PCUA to utilize Chambers as the exclusive out-of-state disposal facility for Passaic County solid waste for the final ten years of the Contract.

48. Furthermore, as modified by the Dewling Certification together with the parties' express and/or implied assent, the Chambers contract obligated PCUA to refrain from entering into any substitute disposal contracts with any facility located outside of New Jersey.

49. In breach of these contractual obligations, PCUA entered into a substitute disposal contract with Empire, pursuant to which PCUA agreed to dispose of Passaic County solid waste at a landfill facility located in Taylor, Pennsylvania, for a period of time commencing December 1, 1993 through and beyond 2002, the final year of the Chambers Contract.

50. Starting in and around December 1, 1993, PCUA began performing under the Empire Contract, and accordingly ceased disposing of Passaic County solid waste at the Chambers landfills as required by the Chambers Contract.

51. PCUA continues to perform under the Empire Contract, and upon information and belief, has no intention of performing under any of the obligations set forth under the Chambers Contract.

52. These actions constitute a complete breach of the Chambers Contract, in that they have resulted in and continue to result in a complete abrogation of PCUA's duty to Chambers to dispose all Passaic County solid waste at the Chambers landfills until the year 2002, unless and until PCUA identifies a suitable in-state facility as directed by the Dewling Certification.

53. PCUA's breach of the Chambers Contract has caused and continues to cause significant economic harm to Chambers, including lost profits from the Chambers Contract, as well as lost profits associated with contracts with other entities that Chambers has foregone in the reasonable belief that PCUA intended

29

on utilizing the substantial airspace set aside for Passaic County solid waste for the final ten years of the Chambers Contract.

Petitioner's App. at 10-12.

Thus, the essence of the averments is that the Dewling Certification required PCUA to identify an in-state disposal facility by 1992 and it approved Chambers as a contingent alternative in the event PCUA failed to identify an in-state facility. The complaint avers that PCUA was obligated to use Chambers as its exclusive out-of-state disposal site. Accordingly, Chambers asserts that PCUA breached its contract when it entered into a contract with Empire for out-of-state waste disposal.

This theory of recovery simply does not interfere with NJDEPE's regulatory functions. Chambers is not asking for specific performance of its contract with PCUA and it is not asking that the district court declare the PCUA-Empire contract void or voidable. Chambers succinctly states: "Chambers seeks contract damages against PCUA for bringing about [the] substitution" of Empire for Chambers. Petitioner's Br. at 27. There is no inconsistency in Chambers' pre-remand and post-remand positions. Moreover, we stated as much in Chambers I. There, we pointed out that even though the parties to this contract apparently understood that it was subject to the approval of NJDEPE, neither party saw fit to specify their rights and obligations if the required approval was never obtained. We stated the following after noting the conditional nature of Commissioner Dewling's Certification:

> Chambers first contends that DEP's contingent approval of the plan made them the exclusive out-of-state disposal facility for Passaic County waste, subject only to the development of in-state alternatives. . . .

> Conversely, the Authority maintains that DEP's contingent approval of the plan amendment permitted it to replace Chambers with any waste disposal alternatives.

Chambers I, 62 F.3d at 585. We then observed that the district court considered "the DEP's contingent plan

30

approval sufficient to justify enforcing the Chambers contract in the absence of DEP approval of some other plan." Id. at 586. However, we faulted the district court for not resolving the effect of the 1987 Dewling Certification upon the Long Term Agreement between Chambers and PCUA.

> The court, however, did not resolve specifically whether DEP's original approval in 1987 made Chambers the exclusive out-of-state waste disposal company for Passaic County waste after December 1, 1992, should PCUA fail to develop in-state waste disposal facilities. Nor did it address whether the Authority could seek a DEP order authorizing it to use an alternative out-of-state waste disposal facility without violating it contract with Chambers.

Id. We then remanded with the specific instructions set forth above. In doing so we specifically allowed Chambers "the privilege to . . . amend its complaint to enable it to present the case in its current status." Id ., at 589. We had hoped that doing so would result in the proper adjudication of this dispute. However, what has followed has only confused the matter further. Chambers exercised the privilege extended in our mandate and amended its complaint. In doing so it did nothing more than attempt to have the district court resolve the saga of this continuing contract dispute by ruling on the effect that the 1987 Dewling Certification had on the Long Term Agreement. However, rather than comply with the mandate and rule upon the issues Chambers raised in the amended complaint, the district court interpreted Chambers' amendments as playing "fast and lose" with the court and applied the doctrine of judicial estoppel. That was clearly error.

We take no position on the merits of the claim Chambers raises in Count One of its amended complaint. Count One merely requires the district court to determine the parties' understanding of the impact of the Dewling Certification on the Long Term Agreement. That is precisely what we had ordered in issuing our mandate, and it is precisely what the district court would have done had it complied with that mandate.

31

V.

Accordingly, we will grant Chambers' petition for a writ of
mandamus, vacate the district court's order granting
summary judgment to PCUA on Count One of Chambers'
amended complaint; and we will remand the case once
again, for further proceedings consistent with this opinion.

Stapleton, Circuit Judge, concurring:

I agree with the court that the district court's disposition of Count One of the Amended Complaint is inconsistent with the prior mandate of this court and that the record does not support a finding that Chambers has "played fast and loose" with the court. Ryand Operations, G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir.1996). I join the opinion of the court to the extent it is not inconsistent with the views expressed in my prior concurring opinion. Chambers Development Company, Inc. v. Passaic County Utilities Authorities, 62 F.3d 582, 589 (3d Cir. 1995).

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit