**In re HARNISCHFEGER INDUSTRIES, INC., et al., Debtors.**

**In re The Beloit Liquidating Trust, Debtors.**

**No. 99–2171 (PJW).**

United States Bankruptcy Court, D. Delaware.

May 15, 2003.

James W. Staib, Morris, Nichols, Arsht & Tunnel, Wilmington, DE, James H.M. Sprayregen, Andrew R. Running, Angela Toscas Wilt, Kirkland & Ellis, Chicago, IL, Counsel for The Beloit Liquidating Trust.

Donald J. Detweiler, Saul Ewing, L.L.P., Wilmington, DE, Hackl, Timothy W. Walsh, Jonathan A. Damon, LeBoeuf, Lamb, Greene & MacRae, New York City, Counsel for Dr. Erhard as Receiver of Beloit Austria GmbH.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Pending before the Court are cross-motions for summary judgment. Dr. Erhard Hackl, the Receiver (the "Receiver") of Beloit Austria GmbH ("Beloit Austria") seeks judgment as a matter of law allowing an administrative expense claim totaling $3,445,605.46 (the "Receiver's Claim")

(Doc.# 11951).[1] The Beloit Liquidating Trust (the "BLT") seeks summary judgment denying the Receiver's Claim or, in the alternative, partial summary judgment that § 558 of the Bankruptcy Code[2] applies to permit setoff of the amount of the Receiver's Claim with amounts owing from Beloit Austria to Beloit (Doc.# 11862).[3] For the reasons set forth below, I will deny both motions.

## BACKGROUND

### A. Beloit's Claim Against Beloit Austria

Impco Voest Alpine, GmbH ("Impco") was a corporate entity organized and operating under the laws of Austria. BWRC, Inc. ("BWRC"), a Beloit Debtor in this case and a wholly-owned subsidiary of Beloit, purchased 99.99% of the stock of Impco, which then became known as "Beloit Austria."[4] Beloit Austria's role in the Beloit organization was to manage Beloit pulp and paper machine projects at various international locations, though primarily in Europe, and to provide certain goods and services to Beloit and Beloit subsidiaries in connection with pulp and paper machine projects. Beloit Austria operated as a separate corporate entity. The BLT asserts that Beloit Austria was strictly responsible for managing and controlling its own finances. The Receiver, however, asserts that Beloit Austria was under the control of Beloit and that Beloit was re-sponsible for every significant decision, commitment, or economic undertaking. Additionally, the Receiver asserts that Beloit's cash management system swept up to the parent level all cash generated by Beloit Austria for whatever purpose Beloit desired, leaving Beloit Austria and its creditors totally dependent on Beloit.

Regardless of how much financial autonomy it actually had, Beloit Austria established a line of credit with a local bank in Austria. That local line of credit was intended to allow Beloit Austria to manage cash-flow problems resulting from shortfalls in collections or mistimed receipts and disbursements. By the end of March 1999, Beloit Austria was suffering from cash-flow problems. Beloit Austria was having difficulty meeting disbursement obligations and several of its vendors threatened to stop delivery or work at its project work sites if they were not paid. Reflecting Beloit Austria's cash-flow problems, at one point its CFO wrote to Beloit that "we do not expect to be allowed to utilize our [local] credit line this week." The Beloit Liquidating Trust's Memorandum in Support of its Motion for Summary Judgment Denying Dr. Erhard Hackl's Administrative Expense Claim, Or in the Alternative Request for Partial Summary Judgment as to the Applicability of § 558 of the Code, Ex. 9(a), (Electronic Correspondence, March 23, 1999, Doc. # OMA 4754) (Doc. # 11863). In order to meet its "most im-

---

1. The Receiver's Claim was initially filed against all the debtors in these administratively consolidated Chapter 11 cases. However, all supporting evidence is connected solely to what are referred to as the Beloit Debtors. Other debtors, referred to as the Reorganizing Debtors, have been dismissed from the case pursuant to a stipulation between the parties filed on December 12, 2001 (Doc. # 12031).

2. The Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, is hereinafter referred to as "§ _____."

3. Pursuant to the Plan of Reorganization confirmed on May 18, 2001 (Doc. # 7902), the BLT is the successor entity to the Beloit Debtors. "Beloit" refers to the Beloit Corporation, the parent entity of the Beloit companies. The terms "Beloit" and the "BLT" will be used interchangeably in this Opinion in reference to the positions they have taken.

4. The remaining .01% of the stock was owned by Beloit.

portant financial needs," Beloit Austria requested that Beloit make payments directly to its third-party vendors. *Id.*

Beginning on March 26, 1999, Beloit began making payments directly to Beloit Austria's vendors. The first payment was made by depositing $153,876 into Waterlink Hycor's bank account. Three days later, direct payments were made to Honeywell Austria in the amount of $288,928.85 and to DESA in the amount of $405,000. The final payment from Beloit to a third-party vendor of Beloit Austria was made on April 20, 1999 when $634,106.33 was remitted from Beloit to Cellier Groupe S.A. The total amount of the third-party vendor payments by Beloit is $1,481,911.18.

Beloit also made deposits directly into the bank account of Beloit Austria. A May 18, 1999 deposit in the amount of $1,570,000 was followed by a June 3, 1999 deposit in the amount of $3,211,800. The Debtors filed their Chapter 11 petitions on June 7, 1999 (the "Petition Date"). On June 25 1999 Beloit deposited $300,000 into Beloit Austria's account. The final deposit was made on September 22, 1999 in the amount of $616,486.[5] The amount directly deposited into Beloit Austria's account is $5,698,286. Accounting for both direct deposits and payments to third-party vendors, Beloit asserts that Beloit Austria owes it $7,180,197.18 (the "Beloit Claim"). Based on the dates of the trans-

actions asserted above, $6,263,711.18 was transferred pre-petition.

Two months after the final deposit was allegedly made by Beloit into Beloit Austria's account, on November 19, 1999 Beloit notified Beloit Austria that it had decided to halt support for its European subsidiaries. That information was made public by Beloit on the same day. One week later, on November 26, 1999 Beloit Austria was placed into bankruptcy proceedings by order of the Commercial Court, Linz, Upper–Austria.[6]

### B. The Receiver's Administrative Claim Against Beloit

The Receiver has filed an administrative claim in the amount of $3,445,605.46 consisting of both performance induced post-petition and post-petition work on pre-petition purchase orders not rejected by Beloit. Beloit raises various objections to the validity of the Receiver's Claim, including an assertion that Beloit Austria cannot establish that the goods and/or services identified on the invoices were furnished post-petition. *See* The Beloit Liquidating Trust's Memorandum in Support of its Objection to Dr. Erhard Hackl's Motion for Summary Judgment (Doc. No. 12032), p. 32 ("BLT Objection"). Beloit also asserts that, even if the Receiver's Claim is valid, § 558 applies and permits Beloit to offset the amount of the Receiver's Claim against the Beloit Claim.[7] *See id.* at 20.

---

5. It is disputed whether this money ever went to Beloit Austria. Beloit asserts that the money was deposited into a French bank account, but the Receiver asserts that no evidence exists that Beloit Austria had any bank accounts in France. Nevertheless, Beloit accounts for both disputed amounts in its claim. For present purposes, it is irrelevant whether they are properly claimed.

6. Despite asserting that Beloit Austria owes it slightly over seven million dollars, Beloit has no claim against Beloit Austria in the Aus-

trian bankruptcy proceedings. A claim was initially made, but was withdrawn after the Receiver filed an objection. The claim was never reasserted, and Beloit is now apparently time-barred from doing so.

7. Section 558 provides: "The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses." 11 U.S.C. § 558.

## DISCUSSION

### 1. Beloit's Setoff Defense

The initial issue that must be addressed is the Receiver's assertion that Beloit is precluded from raising the setoff defense. The Receiver makes two arguments in this regard. First, he argues that the defense is untimely raised and therefore violates this Court's June 17, 2001 Scheduling Order. *See* Memorandum of Law of the Receiver of Beloit Austria GmbH in Opposition to Debtors' Motion for Summary Judgment in Connection with Allowance of Administrative Claim (Doc. # 12025), pp. 7–8 ("Receiver's Opposition"). Second, he argues that Beloit is bound by its representations in the Third Amended Joint Plan and related Disclosure Statement ("Disclosure Statement"). *See id.* at 20.

### A. Scheduling Order

■ Specifically, the Receiver asserts that the setoff claim was not raised prior to the execution of the Scheduling Order, which requires that "all pretrial stipulations, pretrial memoranda of law in which no new issues are raised, and motions in limine be filed two weeks before trial." Stipulated Scheduling Order on Dr. Hackl's Amended Motion for Administrative Claim Against Beloit Corporation (Doc. # 11404), p. 3. The Receiver appears to read that provision as precluding Beloit from raising any new legal arguments as of the date of the Scheduling Order, but giving it until two weeks of the trial date to submit its memorandum of law. I do not agree with the Receiver's reading of the Scheduling Order.

The Scheduling Order is with regard to the Receiver's Amended Motion for Order Allowing and Compelling Payment of Administrative Claim, to which Beloit's Amended Objection was filed at the outset of discovery. The Scheduling Order required that the Receiver's brief in response to Beloit's objection be filed within one week of the completion of depositions (or after the close of discovery). It further provided deadlines to take depositions, to provide other discovery, and provided deadlines for disclosure of expert reports and rebuttals. It is simply inconceivable that, prior to the completion of discovery, the parties would be precluded from raising any legal arguments that might be warranted in light of information obtained during discovery. Rather, the provision precludes the raising of new issues of law within the two-week period prior to trial.

According to the BLT, it is irrelevant whether the Receiver's reading of the Scheduling Order is correct as it disclosed the setoff defense prior to the execution of the Scheduling Order. *See* BLT Objection at 25–27 (Doc. # 12032). The Debtor's Supplemental Objection to Request for Payment By Dr. Erhard Hackl ("Supplemental Objection"), filed by the Debtors on March 28, 2001, contains a section entitled "Beloit Austria is a Net Debtor to Beloit and HII." [8] Supplemental Objection (Doc. # 9537), p. 7. That section indicates that Beloit Austria was extended in excess of $17.7 million in post-petition credit support and that, as a result, Beloit Austria is a net debtor to Beloit.[9] *See id.* at 7–8. The section concludes by asserting that "[t]his dollar value alone substantially off-sets the amounts described in the Claim." *Id.* at 8. One paragraph later, in its conclusion, Beloit again states "any amounts claimed by Dr. Hackl on behalf of the estate are off-

---

**8.** "HII" refers to Harnischfeger Industries, Inc., of which Beloit was a subsidiary.

**9.** Beloit has apparently abandoned its claim that it advanced Beloit Austria in excess of $17.7 million and instead asserts its claim for slightly less than $7.2 million.

set by the amounts Beloit Austria owes the Debtors." *Id.* at 9. As this issue was clearly raised prior to the execution of the Scheduling Order and the parties took discovery on it, Beloit Austria was clearly on notice of a defense of setoff. Beloit has therefore not raised the defense in an untimely manner and the Scheduling Order does not provide grounds to preclude the defense of setoff.[10]

## B. Disclosure Statement

 The Receiver argues that Beloit is bound by its representations in the Disclosure Statement indicating that Beloit Austria is a net creditor of Beloit.[11] On February 2, 2000, Beloit Austria filed two proofs of claim totaling $7,091,686. Those claims were objected to in the 44th Omnibus Objection (Doc. # 6280). A stipulation was ultimately reached by the parties whereby Beloit withdrew the Objection without prejudice. Though the claims had not been resolved, this Court approved the Disclosure Statement on December 6, 2000. Schedule III(B)(7)(c) of the Disclosure Statement, entitled "Intercompany: Trade and Advances," indicates that, as of July 31, 2000, Beloit Austria was a Beloit creditor in the amount of $7,091,686. Schedule III(B)(7)(b), entitled "Intercompany: Loans," does not indicate that Beloit was claiming funds owing to it from Beloit Austria. Based on these facts the Receiver argues that the BLT is judicially estopped from asserting any setoff claim against Beloit Austria.

Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts.

*In re Chambers Development Co., Inc.,* 148 F.3d 214, 229 (3d Cir.1998) (citation omitted).

 However, "[a]sserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." *Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir.1996) (citations and internal quotations omitted). "An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing." *Id.* In sum, judicial estoppel is an:

extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Judicial estoppel is not a sword to be wielded by adversaries unless such

---

**10.** As the setoff defense was raised in the Amended Objection, Beloit Austria is incorrect in its assertion that it was not raised until the parties participated in mediation on September 19, 2001. To the extent it is relevant, Beloit asserts it extensively briefed the issue in its mediation submission. September 19, 2001 was clearly more than two weeks prior to trial, which was originally scheduled for December 14, 2001.

**11.** The Disclosure Statement (Doc. # 7902) is dated December 26, 2000.

tactics are necessary to secure substantial equity.

*Id.* at 365 (citations and internal quotations omitted).

In response, Beloit asserts that it has not asserted inconsistent positions by virtue of raising its setoff defense. *See* BLT Objection at 28 (Doc. # 12032). It also avers that it has in no way played fast and loose with this Court. *See id.* at 30. Beloit states that the Schedules attached to its Disclosure Statement simply reflect the dollar value of the claims asserted by each relevant subsidiary Debtor to other HII-related Debtors as of the Petition Date, and in no way "admit" the validity of those claims. *See id.* at 28. In that regard, the BLT points out that, the Disclosure Statement states, in bold, capital letters on page 2 that:

**"THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ... AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS ADMISSIONS OR STIPULATIONS, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS."** Thus, Beloit cannot be said to have admitted the validity of the Receiver's Claim merely by publishing it in Schedule III(B)(7)(c).

Additionally, Beloit notes that both the Order Approving The Debtors' Disclosure Statement ("Disclosure Order") (Doc. # 7894) and the Order Confirming Third Amended Joint Plan of Reorganization ("Reorganization Order") (Doc. # 10512) expressly reserve the Debtors' rights to pursue any claims or causes of action not provided for in the Schedules.[12] *See* BLT Objection at 29. The Disclosure Order, signed on December 20, 2000, states at

¶ 31 that the Debtors' "failure to identify any claim or Cause of Action in the Disclosure Statement and the Retained Actions Schedules may not be used as a basis to assert that Debtors are barred by res judicata, collateral estoppel, or otherwise from pursuing or defending any such claim or Cause of Action." (Doc. No. 7894), p. 12. More specifically, the Confirmation Order, signed on May 18, 2001, states that:

> Unless a claim or Cause of Action against a Creditor or other person or entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtors retain such claim or Cause of Action for later adjudication ... No preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims or Causes of Action....

(Doc. # 10512), p. 24.

As the Schedules were intended to provide information regarding the debts owed by each subsidiary Debtor to other HII-related entities as of the Petition Date, they contain accurate and necessary information. Beloit was an HII subsidiary and thus a subsidiary Debtor as that term is used in the Disclosure Statement. Beloit Austria is an HII-related entity as it is an indirect subsidiary of Beloit. Beloit was indebted to Beloit Austria in an amount slightly over $7 million, which is reflected in Schedule III(B)(7)(c). However, Beloit Austria is *not* a debtor and thus the fact that it allegedly owes Beloit slightly less than $7.2 million was properly omitted from the Schedules showing debts owed by subsidiary Debtors to other HII-related

---

12. Beloit asserts in its Memorandum in Support of its Objection to Dr. Erhard Hackl's Motion for Summary Judgment that language to that effect can also be found on page 2 of the Disclosure Statement. However, I find no such language on page 2.

entities. Even absent language expressly reserving all claims not identified in the Disclosure Statement, Beloit's non-disclosure of its claim against Beloit Austria would therefore not suffice to bind Beloit to being a net debtor to Beloit Austria.

To the extent that Beloit's silence with respect to its claims against Beloit Austria forms a basis for judicial estoppel, I find that Beloit is clearly not trying to play fast and loose with this Court. Beloit asserts that its claim against Beloit Austria was confirmed through discovery and notes that discovery had not yet commenced when the Disclosure Statement was completed. *See* BLT Objection at 29 (Doc #12032). The Confirmation Order reserved the Debtors' right to prosecute claims or Causes of Action including, without limitation, those not specifically identified in the Plan or those with regard to which the Debtors were not yet aware of all pertinent facts.

I find the Receiver's reliance on the Third Circuit's *Chambers* decision to be misplaced. *Chambers* involved a petition for a writ of mandamus. In a prior ruling in that case, the Third Circuit vacated the district court's grant of summary judgment, concluding that the agreement at issue was "enigmatic" and "susceptible to more than one interpretation." *Chambers*, 148 F.3d at 221. After instructing the district court to interpret the agreement, the Third Circuit remanded "with the privilege to Chambers to amend its complaint to enable it to present the case in its current status." *Id.* Chambers then filed an amended complaint seeking interpretation of the agreement. *See id.* at 222. Rather than do so, the district court concluded that, as Chambers had previously represented it was not seeking to have the court interpret the agreement, judicial estoppel required dismissal of the amended complaint. *See id.* at 222–23. The Third

Circuit issued a writ of mandamus and again vacated the grant of summary judgment after concluding that the district court's interpretation of Chambers' amendments as playing fast and loose with the court and consequent invocation of the doctrine of judicial estoppel was "clearly error" as the Third Circuit had expressly granted Chambers the privilege of seeking interpretation of the agreement. *Id.* at 231–32.

Much like in *Chambers*, the Disclosure Order and especially the Confirmation Order extend Beloit the privilege of prosecuting claims or Causes of Action not expressly disposed of in the Plan or in any final order without being barred by judicial estoppel. Neither Order places any limits on what future claims or Causes of Action can be prosecuted. In fact, the Confirmation Order specifically states that those claims and Causes of Action include, without limitation, those involving facts not yet known to the Debtors, *i.e.* those facts which had not yet been discovered. Beloit asserts it was not able to confirm its claim against Beloit Austria prior to discovery. Barring Beloit from filing a claim or Cause of Action on judicial estoppel grounds, after expressly granting it the privilege to raise that claim or Cause of Action without being barred by judicial estoppel would be inconsistent. There are thus no grounds to preclude Beloit from raising its setoff defense.

2. Validity of the Receiver's Administrative Claim

■■ Priority claims affect two important bankruptcy concerns: minimizing administrative costs during Chapter 11 to preserve the debtor's scarce resources and thus encouraging rehabilitation, *General Am. Transp. Corp. v. Martin (Mid Region Petroleum, Inc.)*, 1 F.3d at 1130, 1132 (10th Cir.1993), and obtaining maximum

and equitable distribution of estate assets to creditors. *See, e.g., BFP v. Resolution Trust Corp.,* 511 U.S. 531, 563, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Therefore, priority claims are narrowly construed. *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 865 (4th Cir.1994). Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status. *See, e.g., Dobbins,* 35 F.3d at 865; *Mid Region Petroleum, Inc.,* 1 F.3d at 1132; *In re Hemingway Transp., Inc.,* 954 F.2d 1, 5 (1st Cir.1992); *In re Columbia Gas Syst., Inc.,* 224 B.R. 540, 549 (Bankr.D.Del.1998); *In re Smith Corona Corp.,* 210 B.R. 243, 245 (Bankr.D.Del.1997).

■■■■■ Determining whether a creditor has an administrative claim is a two-prong test: "first, [the claimant] must show either that the debtor-in-possession (not the pre-petition entity) incurred the transaction on which the claim is based, or that the claimant furnished the consideration to the debtor-in-possession (not the pre-petition entity). Second, it must show that the transaction resulted in a direct benefit to the debtor-in-possession." *In re CIS Corp.,* 142 B.R. 640, 643 (S.D.N.Y. 1992). *See also Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995); *General Am. Transp. Corp. v. Martin,* 1 F.3d at 1133; *In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir.1976); *In re Unidigital, Inc.,* 262 B.R. 283, 288 (Bankr. D.Del.2001). In this case, genuine issues of material fact are in dispute concerning the first prong of the test, precluding the entry of summary judgment in favor of either the Receiver or Beloit.

■■■ In support of his Motion, the Receiver proffers numerous invoices, identified in depositions of various Beloit Austria employees, reflecting services performed on various Beloit projects after the Petition Date. Those invoices involved work performed based on pre-petition purchase orders. Despite the purchase orders being issued pre-petition, "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Thus, if the work in question was performed post-petition, the two-prong administrative claim test is satisfied as the required consideration would have been provided to the debtor-in-possession and the debtor-in-possession would presumably have benefitted from having the projects it had financed completed.

However, Beloit asserts, based on the testimony of a Beloit Austria employee, that without supporting documentation it is impossible to determine the date on which goods and services forming the basis of the invoices were requested. *See* BLT Objection at 36–40 (Doc. # 12032). Additionally, with regard to some of the invoices, it is impossible to determine when the goods or services were provided. *See id.* Beloit also asserts that some invoices involve goods or services allegedly provided by Beloit Austria on a project that was halted about one year prior to the Petition Date. *See id.* Further, Beloit asserts that some charges represent amounts arising from transactions with entities other than the various Beloit Debtors. *See id.* Finally, Beloit asserts that over $1.5 million of the claimed invoices represent "back charges" that were never negotiated.[13]

---

**13.** "Back charges" essentially refers to cost

overruns for services provided by, in this

*See id.* Based on those factual disputes, it is not possible to grant summary judgment in favor of either party with respect to the amount of the Receiver's Claim.

### 3. Choice of Law

Having concluded that Beloit is not precluded from raising its setoff defense and that the amount of the Receiver's Claim cannot be determined at this time as a matter of law, the next issue that must be addressed is whether Austrian or United States law governs the issue of setoff. The Receiver asserts that Austrian law applies. According to the Receiver, the internal corporate affairs doctrine ("internal affairs doctrine"), which "involves those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders," is applicable and "requires that the law of the state of incorporation," which is Austria, govern. *See* Receiver's Opposition at 14–17 (Doc. # 12025), *citing McDermott Inc. v. Lewis,* 531 A.2d 206, 214–215 (Del.1987). In response, Beloit asserts that United States law is controlling as the transactions at issue do not implicate the internal affairs doctrine. *See* The Beloit Liquidating Trust's Memorandum in Support of its Reply to Dr. Erhard Hackl's Objection to the Beloit Liquidating Trust's Motion for Summary Judgment (Doc. # 12195), p. 5 ("BLT Reply"). Additionally, Beloit asserts that United States law applies as the purchase orders forming the basis of the Receiver's Claim contain choice of law provisions making either the law of Massachusetts or Wisconsin applicable. *See id.* at 3–4.

■■■■■ The parties have allegedly agreed on what law governs claims arising out of the purchase orders. Specifically, the purchase orders at issue contain a provision selecting either the law of Massachusetts or Wisconsin, depending on where the purchase order was issued. In determining whether to apply a forum selection clause contained in a purchase order, it must be noted that "[t]here is substantial disagreement among the courts as to whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the state in which it sits or the federal common law choice-of-law rules." *T. Frederick Jackson, Inc. v. Pepper, Hamilton & Scheetz, LLP (In re Olsen Industries, Inc.),* 2000 WL 376398, *12 (D.Del. March 28, 2000). However, as in *Olsen,* "it matters not which choice-of-law rule is applied." *Id.* Delaware law recognizes the validity of choice of law clauses contained in purchase orders. *See Falcon Tankers, Inc. v. Litton Systems, Inc.,* 380 A.2d 569, 582 (Del.Super.Ct.1977). To the extent that federal common law applies, forum selection clauses are *"prima facie* valid and should be enforced." *The M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).[14]

---

case, Beloit Austria that Beloit Austria believed were the responsibility of the other party, in this case Beloit. Apparently, the standard practice was for the parties to negotiate whether the claimed back charge was proper in scope and amount. For example, a back charge of 474,573 British pounds could be negotiated down 400,000 or even 350,000 pounds. The parties dispute whether the invoices relating to back charges have been negotiated and thus whether the amount claimed is proper. More importantly, the parties disagree as to whether back charges were negotiated with regard to contracts between Beloit and Beloit Austria.

**14.** It is unlikely that federal common law is applicable as the construction of contracts "is usually a matter of state, not federal common law." *General Engineering Corp. v. Martin Marietta Alumina, Inc.,* 783 F.2d 352, 356 (3d Cir.1986).

Federal courts are able to create federal common law only in those areas where

Beloit argues that the validity of the forum selection clauses mandates the application of Wisconsin and/or Massachusetts law, which, according to Beloit, both permit setoff. Beloit further asserts that the internal affairs doctrine is inapplicable. The Receiver asserts, however, that a "choice of law clause printed on the back of a purchase order cannot change these more fundamental policy issues [whether the internal affairs doctrine applies]—even assuming someone actually saw it—because parties cannot consent to *ultra vires* acts." Sur–Reply of Dr. Erhard Hackl in Opposition to the Reply Memorandum Submitted by the Beloit Liquidating Trust In Support of the Beloit Liquidating Trust's Motion for Summary Judgment (Docket # 12383), p. 9 ("Sur–Reply").[15] The Receiver therefore asserts that even if the forum selection clause in the purchase orders is valid, the internal affairs doctrine overrides the choice of law clause.

 Both Beloit and Beloit Austria appear to premise their arguments on the assumption that the choice of law analysis can be made under a single determination. However, I believe that the choice of law analysis actually consists of two separate determinations: the law governing the disputes arising from the purchase orders and the law governing the monetary advances from Beloit to Beloit Austria. With respect to the first, I agree with Beloit that the forum selection clauses contained in the purchase orders are valid and enforceable. Thus, I conclude that disputes arising from the performance of those agreements are governed by either the law of Wisconsin or Massachusetts.

 However, whether the monetary advances from Beloit to Beloit Austria, either direct or indirect, constitute an equity investment is an issue separate from the purchase order disputes. At this juncture it is therefore necessary to determine whether the Receiver is correct in his assertion that the internal affairs doctrine applies to the dispute concerning those contributions.[16] As noted above, the internal affairs doctrine is a conflict of law principle, requiring that "the law of the state of incorporation should determine issues relating to internal corporate affairs." *McDermott*, 531 A.2d at 215. The internal affairs doctrine applies to matters "pecu-

Congress or the Constitution has given the courts the authority to develop substantive law, as in labor and admiralty, or where strong federal interests are involved, as in cases concerning the rights and obligations of the United States. Only rarely will federal common law displace state law in a suit between private parties. As the Court in *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 31, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), observed, in a suit between private parties where federal common law is sought to be applied, "normally the guiding principle is that a *significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.*" *Id.* at 356–57 (citations omitted) (emphasis added by *Miree* Court).

15. Though the Receiver does not specify what *ultra vires* conduct exists to mandate voiding the choice of law clause, it appears from his Sur–Reply that he is referring to, in his words, Beloit's decision to incorporate Beloit Austria in Austria, to undercapitalize it at incorporation, to control its finances, sweep its cash up to the parent level on a daily basis, and drive it into insolvency, thereby harming its creditors. *See id.*

16. No choice of law analysis is necessary as all potentially governing jurisdictions, Delaware, Wisconsin, and Massachusetts, as well as federal common law, apply the internal affairs doctrine when warranted. *See McDermott, Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987); *NCR Corp. v. Wisconsin Department of Revenue*, 112 Wis.2d 406, 332 N.W.2d 865, 867 (App.1983); *Harrison v. NetCentric Corp.*, 433 Mass. 465, 744 N.E.2d 622, 628–29 (2001); *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

liar" to a corporation based on the recognition that "only one State should have the authority to regulate a corporation's internal affairs ... because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Of course, it does not apply simply because a corporation is a transacting party. "Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*emphasis in original*).

The internal affairs doctrine generally applies to such issues as:

> steps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, the declaration and payment of dividends and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock.

*Restatement Second of the Conflict of Laws* § 302, comment e (hereinafter the "*Restatement*").

The *Restatement* goes on to state that matters such as those listed above "must be contrasted with the acts dealt with in § 301, which include, for example, the making of contracts, the commission of torts and the transfer of property. There is no reason why corporate acts of the latter sort should not be governed by the local law of different states." *Id.* Comment b to section 301 of the *Restatement* states, in similar language, that many acts "can be done both by corporations and by individuals. Thus, corporations and individuals alike make contracts, commit torts and receive and transfer assets. Issues involving acts such as these when done by a corporation are determined by the same choice-of-law principles as are applicable to non-corporate parties." *Restatement*, § 301(b).

The parties cite no cases concerned with the internal affairs doctrine that are similar to the facts here and independent research has failed to disclose any. However, despite having limited guidance, it appears that *Restatement* section 301(b) is inapplicable. *Restatement* section 301 is titled "Rights and Liabilities to Third Persons" and reads in its entirety: "The rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties." *Restatement*, § 301. Comment a states that "as used in this Section, 'third persons' are persons other than ... stockholders of the corporation." *Id.*, cmt. a. Here, however, the dispute is between one corporation and the corporate parent that is its shareholder.[17] There is no "third party" in the sense envisioned by the drafters of the *Restatement*.

Though the issue here is not one that is enumerated in the Comments to *Restatement* § 302, and though Beloit seeks to frame the issue as a mere contract dispute, the facts support an application of the internal affairs doctrine. Beloit Austria is a wholly-owned indirect subsidiary of Be-

---

17. As noted above, technically BWRC owns 99.99% of Beloit Austria and Beloit owns the remaining .01%. However, BWRC is a wholly-owned subsidiary of Beloit.

loit. Beloit exercised sufficient control over Beloit Austria that dealings between the two entities were not at arms-length. The monetary advances with which Beloit is attempting to offset the Receiver's Claim were made because Beloit Austria had severe cash flow problems, arguably because it was undercapitalized by Beloit. The Receiver asserts that Beloit made all significant economic decisions affecting Beloit Austria, whose cash was swept up to the parent level on a daily basis. *See* Sur-Reply at 9 (Doc. # 12383). The Receiver also asserts that Beloit Austria lacked discretion to refuse entering into contracts that Beloit wished to undertake. *See id.* According to the Receiver, it was those contracts that Beloit Austria entered into, despite ailing financially, that caused it to require an infusion of monies from Beloit. Thus, the Receiver argues that undercapitalizing a subsidiary and forcing it to incur debt while the parent entity benefits from agreements not negotiated at arms-length is something uniquely related to the internal affairs of a corporation. *See id.* at 8–9.

I agree with the Receiver's assertion that the internal affairs doctrine applies to the question of what law governs the treatment of the monetary advances from Beloit to Beloit Austria. The central issue here is the characterization of these advances. Thus, the issue here involves something "peculiar" to a corporation and its shareholder and it involves the internal governance, *i.e.* the transfer of funds from the controlling shareholder to its subsidiary resulting from the performance of contracts directly involving not just the subsidiary but also the controlling shareholder, which contracts apparently were initiated, if not dictated, by the controlling shareholder. Finding that the internal affairs doctrine applies, I now turn to the issue of setoff under Austrian Law.

### 4. Setoff Under Austrian Law

The Receiver has retained an Austrian lawyer, Dr. Peter Lambert, who opines that Austrian law holds that "shareholder contributions of almost any kind (direct contributions, loans, guarantees for the loan of third party, etc.) to a company in financial crisis are not subject to set-off." Receiver's Opposition, Exhibit 1 (Doc. # 12025). Thus, he concludes that Beloit has no setoff rights with respect to the Receiver's Claim. Dr. Lambert relies on cases in which the Austrian courts adopted the German doctrine of "Eigenkapitalersatz," which essentially states that if a shareholder contributes funds to a corporation when a prudent merchant would not have made it a loan, the shareholder may not assert a claim for repayment in an insolvency proceeding. *See id.* Beloit's Austrian lawyer, Dr. Nicholas Simon, predictably opines that Austrian law does permit setoff in situations such as here. *See* BLT Reply, Exhibit A (Doc. # 12195). Dr. Simon asserts that the Austrian courts have established a number of conditions that must be met in order for Eigenkapitalersatz to apply, conditions which have not been met in this case. *See id.* Dr. Simon then notes that Austria does not recognize the concept of *stare decisis,* meaning that none of the cases cited by either expert have any relevance. *See id.* According to Dr. Simon, Eigenkapitalersatz has not yet been codified into Austrian law, which makes it unclear on what grounds any Austrian court has applied it. As it is not codified but yet has been applied, it is Dr. Simon's view that "there is no legal basis for [Eigenkapitalersatz] in Austrian law." *Id.*

I find the declaration submitted by Dr. Simon to be better-reasoned and more persuasive than that submitted by Dr. Lambert. As such, I am not inclined to accept Dr. Lambert's conclusion that set-

off rights do not exist under Austrian law on the facts before me. However, I do not believe that I can rule at this time that setoff rights do exist on the facts before me because the Austrian lawyers' declarations do not sufficiently articulate the relevant facts at issue here.[18] This is particularly so with respect to Dr. Simon's declaration which posit a fact about Beloit's *"de minimis"* shareholder interest in Beloit Austria that I do not agree with. It seems to me that the relevant facts may best be articulated at a trial on the merits and then the Austrian law applied thereto. Alternatively, if the parties were able to agree upon a detailed statement of facts regarding the relationship and dealings between the two corporations and have their respective Austrian lawyers opine on those specific facts then the Court might be in a position to rule on the issue prior to trial. While I have doubts about this alternative, at counsels' election we could have a brief conference to discuss the feasibility of this approach to the setoff issue.

### CONCLUSION

For the reasons stated above, the cross-motions for summary judgment are denied.

### ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, both the Beloit Liquidating Trust's Motion for Summary Judgment Denying Dr. Erhard Hackl's Administrative Expense Claim, Or in the Alternative Request for Partial Summary Judgment as to the Applicability of § 558 of the Code (Doc. # 11862) * and The Motion of the Receiver of Beloit Austria GmbH for Summary Judgment on Al-

lowance of His Administrative Expense Claim Against the Beloit Debtors (Doc. # 11951) * are denied.

---

18. Furthermore, whether by reason of poor translations or because of the difficulty in reconciling Austrian legal concepts with United States legal concepts, I have considerable difficulty understanding the translated Aus-

trian decisions attached to Dr. Lambert's declaration.

* The Doc. # references are to Case No. 99–2171(PJW)